Derry District Court
No. 95-068

## THE STATE OF NEW HAMPSHIRE

### v.

### EDWARD PINKHAM

July 16, 1996

*Jeffrey R. Howard*, attorney general (*Cynthia L. White*, assistant attorney general, on the brief and orally), for the State.

*Paul J. Garrity*, of Londonderry, by brief and orally, for the defendant.

JOHNSON, J. Following a bench trial, the Derry District Court (*Warhall*, J.) found the defendant, Edward Pinkham, guilty of driving under the influence of intoxicating liquor. *See* RSA 265:82 (Supp. 1993) (amended 1995). The defendant appeals, arguing that the court erred in denying his motion to suppress evidence that a police officer obtained when he entered the defendant's driveway. We affirm.

On the evening of July 21, 1994, Officer Miles Sinclair received a citizen complaint about a possible drunk driver. The complaint contained a description of the driver's car, including its license plate

number. The officer obtained the defendant's address from the car's registration listing and drove to the defendant's home. In the driveway he saw a car matching the description given. The car's headlights and taillights were on but the engine was not running. The defendant was sitting in the driver's seat. Officer Sinclair parked his cruiser and walked up the driveway to the car. The car's grill was still warm to the touch. After a brief exchange, he asked the defendant to exit the vehicle and administered several field sobriety tests. Based on the results, he arrested the defendant.

The sole issue we need address on appeal is whether part I, article 19 of the New Hampshire Constitution or the fourth amendment to the United States Constitution applies to Officer Sinclair's warrant-less entry of the defendant's driveway. The defendant argues that the entry was unconstitutional because the officer lacked probable cause to believe a crime had been committed and no exceptions to the warrant requirements applied. We hold that the entry by the officer did not violate the defendant's constitutional protections.

We decide this case based on our interpretation of the New Hampshire Constitution, see *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), using federal law only as a guide to our analysis, see *State v. Maya*, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985). Because the Federal Constitution provides no greater protection to the defendant than the State Constitution, see *United States v. Magana*, 512 F.2d 1169, 1170–71 (9th Cir.), *cert. denied*, 423 U.S. 826 (1975), we conduct no separate federal analysis. *See State v. Bernaby*, 139 N.H. 420, 422, 653 A.2d 1124, 1126 (1995).

Part I, article 19 states: "Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." "Unless a warrantless search [or seizure] falls within one of the few specifically established and well-delineated exceptions, it is *per se* unreasonable." *Ball*, 124 N.H. at 234, 471 A.2d at 352. We have not yet adopted the reasonable expectation of privacy test, see *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), to interpret part I, article 19. *State v. Westover*, 140 N.H. 375, 379, 666 A.2d 1344, 1348 (1995). Although the State urges us to do so now, we decline the invitation. The parties have not "address[ed] the[] interpretive alternatives here, where neither side has briefed the background of article 19 and the history of its application as bearing on the extent to which *Katz* may be a sound guide to our own constitution." *State v. Valenzuela*, 130 N.H. 175, 181, 536 A.2d 1252, 1256 (1987), *cert. denied*, 485 U.S. 1008 (1988). Moreover, application of the reasonable expectation of privacy test would not alter the outcome of this

case. *See Magana*, 512 F.2d at 1170–71; *State v. Cloutier*, 544 A.2d 1277, 1279–80 (Me. 1988), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). Accordingly, we postpone consideration of the reasonable expectation of privacy test until another day.

Our focus, then, is on the specific items protected by article 19 from unreasonable searches and seizures: a subject's person, houses, papers, and possessions. The defendant asserts that his driveway is part of his home's curtilage. He thus invokes the protection given to a subject's home, traditionally interpreted to include certain surrounding property. *Cf. Oliver v. United States*, 466 U.S. 170, 180 (1984) (fourth amendment analysis).

The concept of curtilage in search and seizure law derives from the English common law of burglary. *See United States v. Dunn*, 480 U.S. 294, 300 (1987). According to Blackstone, an unauthorized entry into certain buildings surrounding the dwelling house was as violative of the law as an intrusion into the house itself. W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 960 (G. Chase ed., 4th ed. 1914). The United States Supreme Court has relied on Blackstone's rule to establish a comparable principle under the fourth amendment: certain property surrounding a home deserves the same protection against unreasonable searches and seizures as the home itself. *Dunn*, 480 U.S. at 300; *Oliver*, 466 U.S. at 180; *see Hester v. United States*, 265 U.S. 57, 59 (1924). This protection does not apply to open fields; that is, property outside the curtilage. *Oliver*, 466 U.S. at 180–81 (no expectation of privacy in open fields under fourth amendment analysis); *cf. State v. Pinder*, 128 N.H. 66, 72–74, 514 A.2d 1241, 1244–46 (1986) (rejecting notion that "possessions" in part I, article 19 includes open fields).

The boundaries and contents of the curtilage are not easily described. Curtilage questions are fact-sensitive, and courts resolve them by examining the nature of the area at issue and then asking whether such an area is as deserving of protection from governmental intrusion as the house. We have stated: *"The curtilage includes* those outbuildings which are directly and intimately connected with the habitation and in proximity thereto and *the land or grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic employment."* *State v. Hanson*, 113 N.H. 689, 690–91, 313 A.2d 730, 732 (1973) (emphasis added; citation omitted); *see also Pinder*, 128 N.H. at 74, 514 A.2d at 1246. The Criminal Code defines curtilage similarly for purposes of establishing the amount of force one may use in self-defense. RSA 627:4, :9, I (1986). A driveway leading directly to a house clearly falls within the scope of "land or

grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic employment." *Hanson*, 113 N.H. at 690–91, 313 A.2d at 732. As such, the driveway is part of the curtilage of the home.

Although areas within the curtilage are traditionally accorded constitutional protection, we hold that the driveway in this case was not protected from police entry and no warrant was required. The driveway, in this case, was of a semi-private nature. *Cf. Magana*, 512 F.2d 1170–71 (fourth amendment analysis); *Cloutier*, 544 A.2d at 1279–80 (same); *State v. Ryea*, 571 A.2d 674, 675 (Vt. 1990) (same). The driveway, like a walkway, is an access route to the house typically used by neighbors, mail carriers, salespersons, and other visiting members of the public. *See* 1 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f), at 505–08 (3d ed. 1996) (citing cases). So long as these people have a legitimate reason for entering the property, they have an implied invitation to use the driveway. *Cf. Magana*, 512 F.2d at 1171 (fourth amendment analysis); *Cloutier*, 544 A.2d at 1279–80 (same); *Ryea*, 571 A.2d at 675 (same); 1 LAFAVE, *supra* (same). Police officers have the same right to enter the driveway on legitimate business as other members of the public. Officer Sinclair's investigation of the citizen complaint exemplified legitimate police business. *Cf. Cloutier*, 544 A.2d at 1280 (fourth amendment analysis); *see* 1 LAFAVE, *supra* (same).

We recognize that some driveways, or some portions thereof, may not, in fact, be semi-private areas. Nothing in the record, however, supports such a finding in this case. From the road, Officer Sinclair saw the car parked in the defendant's driveway and was able to see that a person was sitting in the driver's seat. Thus, it appears that no fences or shrubbery nor the house itself blocked that portion of the driveway where the defendant's vehicle was parked from the view of passersby. Moreover, there was no evidence at trial that the driveway was blocked by a gate or posted with "No Trespassing" signs. *Cf. Magana*, 512 F.2d at 1171 (fourth amendment analysis); *Ryea*, 571 A.2d at 675 (same). Although the defendant's car was only ten to fifteen feet from his house, our review of the record persuades us that the defendant's driveway was a semi-private area and, as such, the defendant did not have a right under part I, article 19 to require that the police obtain a warrant before entering his driveway and conducting an investigation.

*Affirmed.*

BRODERICK, J., dissented; the others concurred.

BRODERICK, J., dissenting: This case requires us to determine whether a person is entitled to the protection against unreasonable searches and seizures afforded by part I, article 19 of the New Hampshire Constitution when he sits in a car parked in his driveway. Applying a "protected areas" analysis, the majority concludes that because that portion of the defendant's driveway on which he rested is "semi-private," the defendant is not entitled to the protections of part I, article 19. *See supra* p. 3. Because I believe this question is best resolved by ascertaining whether the defendant had a reasonable expectation of privacy under the State Constitution, I respectfully dissent.

The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., amend. IV. In *Katz v. United States*, 389 U.S. 347 (1967), the United States Supreme Court stated that "the Fourth Amendment protects people, not places." *Id.* at 351. The Court reasoned that "[w]hat a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–52 (citations omitted). To invoke the protections of the fourth amendment, an individual must have entertained a subjective expectation of privacy, and that expectation must be one that society is prepared to recognize as reasonable. *See id.* at 361 (Harlan, J., concurring).

It is clear that the *Katz* court correctly viewed the fourth amendment's prohibition against unreasonable searches and seizures as primarily concerned with governmental invasions of an individual's privacy. Though the amendment was "conceived in response to the use of general warrants and, in particular, the employment of writs of assistance in the Colonies prior to the American Revolution, a practice which caused profound resentment among the colonists," *State v. Pellicci*, 133 N.H. 523, 539, 580 A.2d 710, 720 (1990) (Brock, C.J., concurring specially), its language encompasses more than simple physical intrusions into certain areas, *see Katz*, 389 U.S. at 353. In light of the history of the

amendment and the events preceding its adoption, it may be fairly said that

> the Fourth Amendment embodies . . . the belief that to value the privacy of home and person and to afford it constitutional protection against the long reach of government is no less than to value human dignity, and that this privacy must not be disturbed except in case of overriding social need, and then only under stringent procedural safeguards.

J. LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT: A STUDY IN CONSTITUTIONAL INTERPRETATION 47 (1966).

History also teaches that the fourth amendment derives in no small part from part I, article 14 of the Massachusetts Declaration of Rights. *See* Fraenkel, *Concerning Searches and Seizures*, 34 HARV. L. REV. 361, 362 (1921). Chief Justice Edward F. Hennessey of the Supreme Judicial Court of Massachusetts has observed that "[t]he Declaration of Rights . . . spawned the Bill of Rights of the Federal Constitution, not only in concepts, but in the very words." Hennessey, *The Extraordinary Massachusetts Constitution of 1780*, 14 SUFF. L. REV. 873, 873 (1980). As the United States Supreme Court has recognized that personal privacy is central to the fourth amendment, so too the Massachusetts high court has concluded that in considering questions arising under part I, article 14 of the Massachusetts Declaration of Rights, "it must be determined whether the defendant had a subjective expectation of privacy which can be recognized as 'reasonable.'" *Com. v. Pratt*, 555 N.E.2d 559, 567 (Mass. 1990).

This brings us to part I, article 19 of the New Hampshire Constitution, which provides:

> Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions. Therefore, all warrants to search suspected places, or arrest a person for examination or trial in prosecutions for criminal matters, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation . . . .

This article is based upon part I, article 14 of the Massachusetts Declaration of Rights. *See* LANDYNSKI, *supra* at 38. Indeed, the two provisions are virtually identical, and this court has recognized that part I, article 19, like its Massachusetts antecedent, "safeguards privacy and protection from government intrusion." *State v. Canelo*,

139 N.H. 376, 386, 653 A.2d 1097, 1104 (1995) (citing cases). In *State v. Santana*, 133 N.H. 798, 586 A.2d 77 (1991), for example, we held that under our constitution there exists in an individual's dwelling "a strong expectation of privacy and protection from government intrusion." 133 N.H. at 803, 586 A.2d at 80 (quotation omitted).

Despite recognizing the protection of privacy as the purpose of part I, article 19, we have declined to employ a reasonable expectation of privacy analysis in interpreting the provision's reach. *See, e.g., State v. Sterndale*, 139 N.H. 445, 449, 656 A.2d 409, 411 (1995); *State v. Alosa*, 137 N.H. 33, 37, 623 A.2d 218, 221 (1993). Instead, we have continued to view the protection of privacy through the lens of a "protected areas" analysis. *See Pellicci*, 133 N.H. at 546–47, 580 A.2d at 724–25 (Thayer, J., concurring specially). In *State v. Settle*, 122 N.H. 214, 447 A.2d 1284 (1982), the court opined:

> The "legitimate expectation of privacy" doctrine is no boon to the general administration of the criminal justice system, the law enforcement establishment, the workload of the trial courts, or clearly defined constitutional rights. It introduces into the law enforcement and judicial process yet another flexible threshold determination to be made for the orderly and fair disposition of criminal cases. . . .
>
> Our review of the cases decided under the "legitimate expectation of privacy" doctrine shows us that its administration is not without problems. Appellate courts have been forced to draw fine distinctions whose logical bases are questionable.

*Id.* at 219, 447 A.2d at 1287.

As the instant case demonstrates, strict adherence to a "protected areas" analysis has not proved any great boon to the administration of our criminal justice system. The categorical standards articulated by the majority, which require trial courts to determine first whether an area is curtilage and second whether it is "semi-private," *see supra* p. 3, are inherently unwieldy and difficult to apply. This sort of inflexible analysis inevitably will require the court "to draw fine distinctions whose logical bases are questionable," *Settle*, 122 N.H. at 219, 447 A.2d at 1287, and whose effect may well be inequitable and unjust, *see* Note, *From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection*, 43 N.Y.U. L. REV. 968, 968 (1968).

Simply put, the "protected areas" analysis is too indelicate a tool with which to safeguard privacy under part I, article 19, as it may

well obscure the subtle and intricate aspects of a person's genuine privacy interests. Accordingly, I believe the critical inquiry under the State Constitution should focus upon individual and societal expectations of privacy rather than artificial geographical categories, for in my view part I, article 19, like the fourth amendment, protects people, not places. By emphasizing the privacy of individuals, an expectation of privacy analysis offers a sounder analytical base from which to interpret part I, article 19 consistent with its purpose. Further, this test has the flexibility necessary to ensure part I, article 19's continued vitality in a rapidly changing society.

I would adopt the expectation of privacy analysis and remand this case to the trial court to determine in the first instance whether the defendant "(1) had a subjective expectation of privacy in the place searched . . . that (2) society would accept as reasonable." *Com. v. Krisco Corp.*, 653 N.E.2d 579, 582 (Mass. 1995). The second element of the test "is highly dependent on the particular facts involved and [should be] determined by examining the circumstances of the case in light of several factors," including "the nature of the intrusion, whether the government agents had a lawful right to be where they were, and the character of the location searched." *Id.* On remand, the result in this case may well be the same. An expectation of privacy analysis, however, requires an inquiry sufficiently different from the "protected areas" analysis that I believe remand would be appropriate.

In advocating the adoption of the expectation of privacy analysis under part I, article 19, I am not suggesting we also accept, without question, the federal case law construing and applying this test. We consistently have interpreted our State Constitution independently of the United States Constitution, often concluding that it provides individuals greater protection than its federal counterpart. *See, e.g., Sterndale*, 139 N.H. at 449–50, 656 A.2d at 412 (rejecting an automobile exception to the warrant requirement); *Canelo*, 139 N.H. at 387, 653 A.2d at 1105 (rejecting a good faith exception to the exclusionary rule). Adoption of the expectation of privacy analysis would require no deviation from this course.