Belknap
No. 2003-232

STATE OF NEW HAMPSHIRE

v.

JAMES JOHNSTON, JR.

Argued: November 12, 2003
Opinion Issued: January 8, 2004

*Peter W. Heed,* attorney general (*Susan P. McGinnis,* assistant attorney general, on the brief and orally), for the State.

*Matthew J. Lahey, P.A.,* of Laconia (*Matthew J. Lahey* on the brief and orally), for the defendant.

DUGGAN, J. The defendant, James Johnston, Jr., appeals his conviction in Superior Court (*Perkins,* J.) on five counts of possession of child pornography. *See* RSA 649-A:3, I(e) (Supp. 2002). On appeal, the defendant argues that the trial court erred in denying his motion to suppress evidence obtained during a search of his home. We affirm.

The following facts were adduced at the suppression hearing. In May 1999, the defendant used his credit card to purchase a subscription to a child pornography website from Landslide.com. In September 1999,

federal authorities raided Landslide's Texas offices and confiscated records that revealed the defendant's earlier purchase.

On May 24, 2001, Detective Steven Crockett of the Belmont Police Department attended a meeting at State Police headquarters, at which he learned that Landslide's records indicated that the defendant had purchased a subscription to the website. Because there was some concern about the accuracy of the two-year-old information, authorities recommended that officers use a "knock and talk" procedure. Detective Crockett received a copy of a "[r]ecommended dialogue for knock and talk approach," as well as a diskette that detects child pornography on computer hard drives.

On June 4, 2001, at about 4:00 p.m., Detective Crockett and Detective Simmons of the Laconia Police Department, both in plain clothes, visited the defendant at his mobile home. The officers drove into the defendant's driveway, parked behind the defendant's car and knocked on the front door. When the defendant opened the door, the officers identified themselves and told the defendant that "an investigation [] revealed that his computer might have been compromised by having an illegal purchase made through his Internet account." The officers also told the defendant that they wanted to use a disk to check his computer for any illegal activity. When the defendant asked "what type of illegal activity" they were investigating, Detective Crockett told him that they were looking for child pornography. The defendant "acted surprised" and told the officers that they "certainly could come in and check what [they] needed to check."

The defendant then directed the officers to a computer in his living room. As the officers were inserting the disk into the defendant's computer, the defendant asked what would happen if they found anything. Detective Crockett said that "they would talk about it if that were the case." As Detective Crockett and the defendant looked on, Detective Simmons inserted the disk into the computer and child pornography images were revealed.

Detective Crockett immediately advised the defendant of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant indicated that he understood his rights and he wanted to cooperate. Thereafter, Detective Crockett gave the defendant a form entitled, "Written Consent For Search." According to his own testimony at the suppression hearing, the defendant read the form over from "top to bottom," understood it and signed it. The form authorized a search of the defendant's computer systems and software including "internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes . . . and other memory storage devices)."

Detective Crockett then asked the defendant if he had other computers or child pornography in his residence. In response, the defendant led the officers to a bedroom where there was another computer. The officers inserted the disk into this second computer, and additional child pornography images were revealed. According to Detective Crockett, the defendant then volunteered that he had child pornography under his bed. The officers recovered approximately 475 photos that the defendant had printed from his computer and stored under his bed. The officers seized both computers but did not arrest the defendant that day.

The defendant's testimony at the suppression hearing was, for the most part, consistent with that of Detective Crockett. The defendant, however, said that when the officers told him they were looking for child pornography, he agreed to let them search his computers because "[he] thought [he] had to." Specifically, the defendant reasoned: "He's the police officer. He's an authority figure, and I believe that I had . . . to let him do it. He was investigating the child pornography, something illegal, so I thought . . . it would be obstruction of justice if I didn't."

On appeal, the defendant argues that: (1) the entry upon the curtilage of his home was unconstitutional; (2) his consent to enter and search his home was not voluntary; (3) this court should adopt a rule that requires police officers employing the knock and talk procedure to advise citizens of their right to refuse consent; and (4) his consent to search was obtained as a result of a custodial interrogation not preceded by a valid waiver of his *Miranda* rights, and, therefore, his consent was not knowing and intelligent. We address each argument in turn.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. *State v. Hight*, 146 N.H. 746, 748 (2001). Our review of the trial court's legal conclusions, however, is *de novo. Id.*

The defendant first argues that the police officers' warrantless entry upon the curtilage of his home was a violation of Part I, Article 19 of the New Hampshire Constitution. More specifically, the defendant argues that because the officers entered the curtilage of his home for the predetermined purpose of searching his home, the warrantless entry was pretextual and unconstitutional. In contrast, the State contends that it was constitutionally permissible for the officers to enter the curtilage of the defendant's home without a warrant because the defendant's driveway was semi-private in nature, and the officers entered the property for a legitimate purpose, namely to investigate information they received indicating that the defendant may be involved in criminal activity. We hold

that the officers' warrantless entry upon the curtilage of the defendant's home did not violate Part I, Article 19.

We decide this case based upon our interpretation of the New Hampshire Constitution, using federal law only as a guide to our analysis. *State v. Pinkham*, 141 N.H. 188, 189 (1996). Because the Federal Constitution provides no greater protection to the defendant than the State Constitution, we conduct no separate federal analysis. *Id.*

"Our State Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures. It particularly protects people from unreasonable police entries into their private homes, because of the heightened expectation of privacy given to one's dwelling." *State v. Goss*, 150 N.H. 46, 48 (2003) (quotation omitted). Moreover, we have recognized that "certain property surrounding a home deserves the same protection against unreasonable searches and seizures as the home itself." *Pinkham*, 141 N.H. at 190. In light of these principles, we first determine whether the detectives' warrantless entry upon the curtilage of the defendant's home violated his reasonable expectation of privacy. *See Goss*, 150 N.H. at 48–49.

In *Goss*, we adopted a two-part analysis for determining whether there is a reasonable expectation of privacy: first, that an individual "have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 49 (quotation omitted). In analyzing these factors, we are mindful that "[c]urtilage questions are fact-sensitive." *Pinkham*, 141 N.H. at 190.

Here, the trial court found that the defendant's mobile home and garage were approximately 100 feet from the road, and that no large shrubs or fences hid "the front curtilage of the home." As such, the house, garage and driveway were visible from the road. Moreover, the driveway was not blocked by a gate or posted with "No Trespassing" signs. Thus, we conclude on these facts that the defendant had no reasonable expectation of privacy in the curtilage of his home.

This conclusion is consistent with the result we reached in *Pinkham*. Although we did not analyze the facts in *Pinkham* under the reasonable expectation of privacy framework, we held that the defendant's driveway was not constitutionally protected because it was visible from the road, not blocked by fences or shrubbery, and not "posted with 'No Trespassing' signs." *Id.* at 191. The facts of the present case are indistinguishable.

The defendant next argues that he did not voluntarily consent to the search of his home. More specifically, he argues that his consent was not voluntary because he was unaware of his right to refuse consent, the

officers were deceptive and the knock and talk procedure is inherently coercive. In addition, in order to cure potential constitutional defects, the defendant encourages us to adopt a rule that would require police officers employing the knock and talk procedure to advise a citizen of the "right to refuse consent to the search." The State argues that we should refuse to adopt the rule proposed by the defendant because it would be inconsistent with this court's jurisprudence and is not mandated by the New Hampshire Constitution.

A "voluntary consent free of duress and coercion is a recognized exception to the need of both a warrant and probable cause." *State v. Sorrell*, 120 N.H. 472, 475 (1980). The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing and voluntary. *State v. Patch*, 142 N.H. 453, 458 (1997). The validity of the consent is determined by examining the totality of the circumstances. *State v. Jones*, 131 N.H. 726, 728 (1989). We will disturb the trial court's finding of consent only if it is not supported by the record. *State v. Hammell*, 147 N.H. 313, 318 (2001).

Here, the trial court found that the State met its burden of proving that the defendant's consent was free, knowing and voluntary. In reaching its conclusion, the trial court relied upon the following facts:

> There was nothing coercive about the officer's [*sic*] conduct. The hour of the day was reasonable. They were dressed in plain clothes. The tone remained polite and calm and no threats of any kind were made. They asked to enter one time and the defendant, acting in a very cooperative manner, invited them into his home. Moreover, once the officers explained their purpose, the defendant freely directed them to his computer, knowing that they were looking for illegal child pornography even before they informed him of this. Once the alleged child pornography was discovered on the living room computer, he directed the officers to another computer in his bedroom and subsequently to alleged child pornography under his bed. In addition, the defendant signed a consent form indicating his consent to search the computers. Not only did the defendant freely, knowingly and voluntarily consent to the officers' entry into his home and search of his computers, the defendant was so cooperative that he pointed out and retrieved hard copies of more alleged child pornography located under his bed.

■ The facts set forth above support the trial court's finding that the defendant consented to the search. At all times, the officers acted in a non-coercive manner. Specifically, they were dressed in plain clothes, they visited the defendant's home at 4:00 in the afternoon and they did not threaten him. Moreover, even after the officers explained that they were looking for child pornography, the defendant directed them to the two computers in his home and the alleged child pornography that he stored under his bed. Importantly, the defendant also signed a consent to search form, which permitted the officers to search his computers. Based upon our analysis of the totality of the circumstances, we find that the trial court did not err when it ruled that the State met its burden of proving, by a preponderance of the evidence, that the defendant freely, knowingly and voluntarily consented to the search of his home.

The defendant encourages us to adopt a rule that would require police officers using the knock and talk procedure to advise a citizen of the right to refuse consent to a search. To support his argument, the defendant relies upon a Washington Supreme Court decision.

In *State v. Ferrier*, 960 P.2d 927, 930 (Wash. 1998), the defendant argued that the knock and talk procedure employed by the police violated her right to privacy guaranteed by the Washington State Constitution, "and thus invalidated the consent she gave to the officers to search her home." In *Ferrier*, the police received information from the defendant's son that the defendant "was conducting a marijuana grow operation at her house." *Id.* at 928. Four police officers, all armed and wearing black raid jackets, arrived at the defendant's home. *Id.* Two officers went to the back of the house to secure the premises, while the other two officers approached the defendant's front door. *Id.* The defendant testified that "when the officers were at her front door they said they wanted to talk to her about her son, and that they then stepped into the house while they said that." *Id.* at 929 (quotation omitted). The defendant further testified that she was terrified and she only consented to the search because the police told her that they were going to take away her grandchildren, who were in her home at the time. *Id.*

The Washington Supreme Court analyzed these facts under the constructs of its State Constitution and adopted the following rule:

> [W]hen police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they

> can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.

*Id.* at 934. In reaching this conclusion, the court relied upon the fact that the Washington State Constitution "goes further than the Fourth Amendment in protecting against warrantless searches and seizures, with no express limitations to this protection." *Id.* at 931 (quotation omitted). In addition, the court pointed to long-standing protection provided by the legislature, which makes it "a gross misdemeanor for any policeman or other peace officer to enter and search any private dwelling house or place of residence without the authority of a search warrant issued upon a complaint as by law provided." *Id.* (quotation omitted). For these reasons, and based upon its finding that the knock and talk procedure is inherently coercive, the court concluded that the knock and talk procedure employed by the officers in *Ferrier* was a violation of the State Constitution, and, thus, it adopted the rule set forth above. *Id.* at 933-34; *see also State v. Johnson*, 346 A.2d 66, 68 (N.J. 1975) (holding that in non-custodial situations, "if the State seeks to rely on consent as the basis for a search, it has the burden of demonstrating knowledge on the part of the person involved that he had a choice in the matter").

We recognize that the sanctity of the home is jealously guarded by a long line of cases. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (quotation omitted)). We further recognize that the knock and talk procedure is widely used and frequently litigated.

One problem with the knock and talk procedure is that the police may attempt to obtain consent by minimizing the seriousness of the situation or by acting in a deceptive manner. The Washington Supreme Court has gone so far as to characterize the procedure as "inherently coercive to some degree." *Ferrier*, 960 P.2d at 933. Indeed, in this case, the officers initially minimized the situation by telling the defendant that they were there to investigate whether his computer had been compromised.

Although we are cognizant of the potential for abuse inherent in the knock and talk procedure, we are not prepared to adopt the *Ferrier* rule today. Other than *Ferrier*, the defendant has failed to identify any cases where a court determined that the knock and talk procedure was used inappropriately.

Moreover, the officers in this case did not use the procedure in an untoward manner. We emphasize that the officers here were not deceptive; when the defendant inquired as to the illegal activity in question, they specifically stated that they were looking for child pornography. Detective Crockett testified that had the defendant given any indication that he did not want to cooperate, he would not have persisted in attempting to obtain consent. *Cf. Jones*, 131 N.H. at 728-29. In addition, unlike the defendant in *Ferrier*, the defendant did not testify that he consented to the search because he was terrified. *Ferrier*, 960 P.2d at 929. Rather, the defendant testified that he consented to the search of the computer in his living room because "[he] thought [he] had to."

The circumstances under which the officers gained entry to the defendant's home in this case are distinguishable from *Ferrier*. Here, only two officers went to the defendant's home and both approached the front door in broad daylight. The officers, both in plain clothes, introduced themselves and only entered the defendant's home after he invited them in. We note that the police officers here did not have sufficient information to obtain a search warrant. This is, therefore, not a case where the police were attempting to circumvent the warrant requirement.

■ Although we do not adopt the *Ferrier* rule, trial courts should scrutinize the facts of each knock and talk case with special care to determine whether the procedures rise to a level of coercion that is constitutionally impermissible.

Finally, the defendant argues that his consent to search was obtained as a result of a custodial interrogation not preceded by a waiver of his *Miranda* rights, and, therefore, he contends that his consent was not knowing and intelligent. We disagree.

The *Miranda* decision was based upon "the need to protect the fairness of the trial itself." *Schneckloth v. Bustamonte*, 412 U.S. 218, 240 (1973).

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a "knowing" and "intelligent" waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

*Id.* at 241.

■ Many courts have held that *Miranda* relates "to the compulsory self-incrimination barred by the Fifth Amendment and not to unreasonable

searches and seizures proscribed by the Fourth Amendment." *Cato v. State*, 396 N.E.2d 119, 124 (Ind. 1979); *accord United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994); *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994); *United States v. Moreno*, 897 F.2d 26, 33 (2d Cir. 1990); *State v. Hardy*, 451 S.E.2d 600, 611 (N.C. 1994); *State v. Turner*, 401 N.W.2d 827, 836-37 (Wis. 1987); *State v. Packett*, 297 N.W.2d 762, 764 (Neb. 1980). Thus, we conclude that the defendant had no constitutional right to be advised of his *Miranda* rights prior to consenting to the search.

*Affirmed.*

DALIANIS, J., concurred; BROCK, C.J., retired, specially assigned under RSA 490:3, concurred.