NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2013-182


THE STATE OF NEW HAMPSHIRE

v.

STEPHEN SOCCI

Argued:  February 12, 2014
Opinion Issued:  July 8, 2014


Joseph A. Foster, attorney general (John J. Kennedy, attorney, on the brief and orally), for the State.


Lothstein Guerriero, PLLC, of Concord (Theodore M. Lothstein on the brief and orally), for the defendant.


HICKS, J.  The defendant, Stephen Socci, appeals an order of the Superior Court (Delker, J.) denying his motion to suppress evidence leading to his convictions, following a bench trial upon stipulated facts, on charges of manufacturing a controlled drug and possession of a controlled drug with intent to sell.  See RSA 318-B:2, I (2011).  He argues that the court erred in denying the motion because the evidence resulted from:  (1) an unlawful search of his property; and (2) a subsequent consent to search that was given involuntarily and/or tainted by the prior unlawful search.  We vacate and remand.

The trial court found, or the record supports, the following facts. On August 10, 2011, officers from the Rockingham County Drug Task Force traveled to the defendant's home after learning that he allegedly had purchased from a Massachusetts company equipment customarily used for growing marijuana. The officers intended to conduct a "knock and talk" in order to secure the defendant's consent to search the premises.

Four officers arrived at the property in two vehicles. Lieutenant Joel Johnson, of the Kingston Police Department, and Chris St. Onge, a deputy sheriff for Rockingham County, approached the home while Detective George Wickson and another officer remained in the driveway to inspect a detached garage where they believed marijuana was present. The driveway is paved and extends between the house and the detached garage. The court found that the pavement "completely envelop[s] the garage." Wickson testified at a suppression hearing that, when he exited his vehicle, he was "overcome immediately by the fresh smell of fresh growing marijuana." He testified that, upon walking toward the garage — unimpeded by any object blocking his path — he observed that its windows were covered, and that there was mildew on its doors and windows. He walked around the perimeter of the garage and observed an electric meter spinning quickly as well as a smoke stack and blower. These observations were, in his experience, consistent with what the court called a "marijuana grow operation."

Meanwhile, Johnson and St. Onge knocked on the door to the defendant's house. Melissa Socci, the defendant's wife, answered the door and allowed the officers into her home after they identified themselves. The officers asked for consent to search the property, but Melissa declined, explaining that she would not consent without talking to her husband. During this conversation, the officers received a radio communication from Wickson regarding his observations of the garage. Melissa testified that she overheard this communication, and Johnson confirmed that she may well have overheard the radio transmission. Melissa called her husband at his workplace, and St. Onge asked the defendant, over the phone, for his consent to search the premises. The defendant declined, but said he would return home to speak with the officers.

The defendant arrived approximately twenty minutes later and spoke with Johnson and St. Onge in the driveway. Johnson informed the defendant of the evidence against him, and asked for consent to search the garage. In addition, the defendant spoke privately with St. Onge. The parties offered conflicting testimony regarding the events that transpired next. The defendant and Melissa offered nearly identical testimony that, in Melissa's words, Johnson threatened the defendant that he would "leave an officer on the premises[,] . . . get a search warrant and . . . come back with sledgehammers and crowbars, and that things would get messy, people would be arrested" if

the defendant did not consent. Melissa further testified that, when she asked St. Onge whether the officers would take her children, he replied, "Just as long as you cooperate, no one[] wants to take your kids." Johnson recalled that he assured the defendant that no one would be arrested that day and explained that an indictment would follow if incriminating evidence was found on the property. He testified that no threats were made, and that the defendant appeared calm as he was read his <u>Miranda</u> rights, <u>see</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and reviewed a consent form the officers provided.

The defendant ultimately consented to a search of his property by signing the consent form. The officers searched the premises after the defendant provided them with a key to the garage; they found a "marijuana grow operation" in the garage and other incriminating evidence within the home. The defendant was indicted by a Rockingham County grand jury on two counts under the Controlled Drug Act: (1) knowingly manufacturing at least five pounds of marijuana; and (2) knowingly possessing at least five pounds of marijuana with the intent to sell. <u>See</u> RSA 318-B:2, I.

The defendant filed a motion to suppress "all evidence . . . acquired as a result of the entry upon [his] property, . . . and the subsequent search" of the curtilage of his home, on the grounds that the search "was not done pursuant to any warrant or pursuant to any recognized exception to the warrant requirement." The suppression hearing included testimony from Wickson, Johnson, the defendant, and Melissa Socci. The trial court denied the motion and determined that: (1) the defendant's driveway was "semi-private" and thus "not deserving of traditional curtilage protection"; (2) the defendant had no reasonable expectation of privacy in the exterior of his garage; and (3) his consent to search "was given freely, knowingly, and voluntarily." He was found guilty on both counts. This appeal followed.

On appeal, the defendant argues that the trial court erred in denying his motion to suppress. He argues that the initial, warrantless search of the exterior of his garage violated his state and federal constitutional rights to be free from unreasonable searches and seizures, <u>see</u> N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV, and that "[t]he unlawful search tainted [the] consent" that he later provided to search his property. Alternatively, he argues that, "even if the [initial] garage search was not unlawful, when the totality of the circumstances is considered, [his subsequent] consent [to search] was not given freely, knowingly and voluntarily," but "[i]nstead, . . . was coerced."

The State asserts that "[t]he defendant's consent to search his residence was free, knowing, and voluntary, and was not tainted by any prior illegal police activity." In support of this claim, it first argues that "[t]he only evidence that the defendant was confronted with before he gave his consent to search was the strong odor of fresh marijuana, which [the police] lawfully smelled from

3

the defendant's driveway." It contends that this "lawfully smelled odor" was detected during the first of "two distinct searches," when Wickson "stepped out of [his] vehicle" — which was "parked . . . on a paved portion of the driveway between the defendant's home and his garage" constituting a "direct access route to the defendant's house" — and "immediately smelled a strong odor of fresh marijuana." The State contends that this first search violated neither Part I, Article 19 of the New Hampshire Constitution nor the Fourth Amendment to the United States Constitution. It argues that a second search, which it does not contend was lawful, occurred when Wickson "proceeded to walk toward the defendant's garage" and made visual "observations from the area around [the] garage." The State concludes that, "[e]ven if these observations . . . were an unconstitutional search, the defendant's consent was not vitiated because his consent was not obtained by exploitation of the unlawful search[, and,] . . . [a]lternatively, the primary taint of that search was purged." Finally, the State argues that "[t]he totality of the circumstances establishes that the defendant gave free, knowing, and voluntary consent to search his residence."

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review its legal conclusions de novo. State v. Dalton, 165 N.H. 263, 264 (2013), cert. denied, 134 S. Ct. 1313 (2014). Because the defendant places significant emphasis upon whether the pre-consent search was lawful under the Federal Constitution, we first address this issue under the Federal Constitution. See State v. McLeod, 165 N.H. 42, 47 (2013).

The Fourth Amendment to the United States Constitution provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (quotations omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions," id., including objectively reasonable searches under exigent circumstances, see id., and objectively reasonable searches "with the voluntary consent of an individual possessing authority" over the premises, Georgia v. Randolph, 547 U.S. 103, 109 (2006).

In its recent decision in Florida v. Jardines, 133 S. Ct. 1409 (2013), the United States Supreme Court clarified that the Fourth Amendment "establishes a simple baseline . . . : When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." Jardines, 133 S. Ct. at 1414 (quotations omitted). The Court explained that,

4

although consideration of a defendant's reasonable expectation of privacy "may add to the baseline," id., the "reasonable-expectations test has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas," id. at 1417 (quotation omitted). In Jardines, as in this case, it was undisputed that police officers had physically intruded on "the area immediately surrounding and associated with the home," known as the curtilage, which the Court "regard[s] . . . as part of the home itself for Fourth Amendment purposes." Id. at 1414, 1415 (quotations omitted). Accordingly, "the only question [was] whether [the defendant] had given his leave (even implicitly) for them to do so." Id. at 1415.

To answer this question, the Court first recognized the outer limitations of a customary license that a homeowner or occupant implicitly provides to visitors — including police officers — to enter the curtilage of his or her home:

> This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

Id. at 1415-16 (quotation omitted). Setting aside any consideration of the defendant's reasonable expectation of privacy, the Court held: "That the officers learned what they learned only by physically intruding on [his] property to gather evidence" — which, the Court noted, "is not what anyone would think he had license to do" — "[was] enough to establish that a search occurred" within the meaning of the Fourth Amendment. Id. at 1417.

Here, Wickson's entry into the area surrounding the detached garage to gather evidence — what the State deems the second of "two distinct searches" — "renders this case a straightforward one" under the Federal Constitution. Id. at 1414. In fact, the State concedes that "under, at least, Florida v. Jardines, . . . it probably does violate the Fourth Amendment to walk around the garage — the observations made around the garage." We hold that Wickson conducted a search under the Fourth Amendment when, with the purpose of gathering evidence, he physically intruded on the area surrounding the defendant's garage — an area undisputedly within the curtilage — "which is not what anyone would think he had license to do." Id. at 1417. Put another way, the defendant's implicit license "permit[ting] . . . visitor[s] to

5

approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," id. at 1415, did not extend so far as to allow a private citizen, let alone a police officer "not armed with a warrant," id. at 1416, to circle his garage to gather evidence. Because Wickson's physical intrusion on the undisputed curtilage of the home to gather evidence was neither "explicitly [n]or implicitly permitted by the homeowner," id. at 1414, it was a search under the Fourth Amendment, id. at 1417. As it was conducted without a warrant, and under no recognized exception to the warrant requirement, the search "was not constitutionally permissible" under the Federal Constitution, Mincey v. Arizona, 437 U.S. 385, 390, 395 (1978), and evidence obtained as a result of the search was, "by that same authority, inadmissible in a state court," Mapp v. Ohio, 367 U.S. 643, 655 (1961). Having determined that the pre-consent search of the area surrounding the garage was unlawful under the Federal Constitution, we need not reach the defendant's claim that it also violated the State Constitution. Cf. State v. Lantagne, 165 N.H. __, __, 83 A.3d 397, 401 (2013).

We next consider whether the evidence obtained following the defendant's consent must also be suppressed as fruit of the illegal search. Cf. Orde, 161 N.H. at 268-69 (holding, under State Constitution, that defendant's statements and evidence resulting from search warrant, all obtained through exploitation of illegal search of curtilage, should have been excluded as fruit of illegal search). "The fruit of the poisonous tree doctrine requires the exclusion from trial of evidence derivatively obtained through a violation of Part I, Article 19 of the New Hampshire Constitution." Id. at 268. We have recognized that the doctrine applies when "the primary illegality [is] a Fourth Amendment violation." State v. Barkus, 152 N.H. 701, 706 (2005). "If the evidence in question has been obtained only through exploitation of an antecedent illegality, it must be suppressed." Orde, 161 N.H. at 268. "Accordingly, the question to be resolved is whether, granting establishment of the primary illegality, the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id.

> In determining whether the taint of a Part I, Article 19 violation has been purged, we consider the following factors: (1) the temporal proximity between the police illegality and the acquisition of the evidence sought to be suppressed; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.

Id. (quotation omitted) (holding that taint of illegal search of curtilage "was not purged before the defendant made incriminating statements to the police"); see also State v. Hight, 146 N.H. 746, 751 (2001) (holding that the State had "failed to purge the taint of the defendant's unlawful detention and that the evidence

6

procured through the defendant's consent should have been suppressed").  We adopted these factors from the United States Supreme Court, see Hight, 146 N.H. at 750, which has applied them to Fourth Amendment violations, see, e.g., Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (applying factors to determine whether a confession "[was] obtained by exploitation of an illegal arrest").  Accordingly, we conclude that these factors are relevant to determining whether the taint of an illegal search has been purged when, as here, the search violated the Fourth Amendment.

The State argues that, "[e]ven if the[] observations from the area around the garage were an unconstitutional search, the defendant's consent was not vitiated because [it] was not obtained by exploitation of the unlawful search." In support of this contention, the State first claims that "[t]he record clearly supports the trial court's finding that the defendant was confronted only with the smell of the fresh marijuana, which . . . was not unlawfully obtained evidence."  (Emphasis added.)  In effect, the State argues that Wickson kept his nostrils "open" while lawfully on "[t]he route any visitor to a residence would use," and that the officers confronted the defendant solely with the odor Wickson detected while on this route, rather than with the observations he made from the area surrounding the garage during what we hold herein was an illegal search.  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(e), at 773-75 (5th ed. 2012) ("The route any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open . . . ." (quotations and footnotes omitted)); cf. California v. Ciraolo, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

Contrary to the State's assertions, however, the trial court made no finding that the officers confronted the defendant solely with the odor of marijuana detected in this manner.  Although the court found that Johnson "told the defendant that one of the officers could smell marijuana and asked [him] for consent," this statement does not indicate that the defendant was also not confronted with other evidence.  For example, the defendant testified that Johnson confronted him with evidence of the electric meter running.  Although the court "[found] the testimony of the State's witnesses more credible than that of the defendant and his wife," this finding is immediately preceded by the court's own observation that, "[a]ccording to Lt. Johnson, . . . the defendant gave consent after being informed of some of the observations the officers had made around the garage."  (Emphasis added.)  Finally, without further clarification, the court "[found] that the defendant was calmly informed of the evidence against him while standing in his driveway over the course of ten minutes."  (Emphasis added.)  Because its findings are unclear, we remand for

the trial court to determine whether, prior to his consent, the defendant was confronted with evidence obtained as a result of the illegal search of the area surrounding his garage, and whether the evidence obtained following the defendant's consent "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Orde, 161 N.H. at 268.

The State argues that, "[e]ven if the defendant was confronted with the observations made from the area surrounding his garage, the taint of this prior illegality was sufficiently purged when [he] gave his consent to search his property." (Bolding omitted.) Because it found, erroneously, that no illegal search had occurred, the trial court made no findings as to whether the taint of this illegality had been purged prior to the defendant's consent. Instead, the court limited its analysis of the defendant's consent to the separate issue of whether it "was given freely, knowingly, and voluntarily." In State v. Hight, we noted that whether a purported consent was voluntary is a question independent of whether it was obtained by the exploitation of a prior illegality; "consequently[,] the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality." Hight, 146 N.H. at 750 (emphasis added) (quotation omitted). Accordingly, as previously stated, the trial court must determine "whether, granting establishment of the primary illegality, the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Orde, 161 N.H. at 268.

Finally, the defendant argues that, "when the totality of the circumstances is considered, [his] consent was not given freely, knowingly and voluntarily," but "[i]nstead, . . . was coerced." "A voluntary consent free of duress and coercion is a recognized exception to the need of both a warrant and probable cause." State v. Johnston, 150 N.H. 448, 453 (2004) (quotation omitted). "The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing and voluntary." Id.; cf. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (footnote omitted)). "The validity of the consent is determined by examining the totality of the circumstances." Johnston, 150 N.H. at 453. "We will disturb the trial court's finding of consent only if it is not supported by the record." Id.

The trial court failed to make particularized factual findings with regard to several critical allegations underlying the defendant's voluntariness argument. For example, it did not specifically determine whether the officers in

fact or implicitly threatened to make arrests, to use crowbars and sledgehammers, or to take away the defendant's children, if he did not consent to a search.  Instead, it found that, "even assuming the truth of [the defendant's and Melissa Socci's] testimony regarding the[se] threats . . . [,] the defendant's consent was [not] induced by intimidat[ion] or coercion." (Emphasis added.)  In so ruling, the court relied upon our observation in State v. Patch, 142 N.H. 453 (1997), that a statement by officers that they "would apply for a search warrant" if the defendant did not consent to a search presented him with a "viable alternative[]" to cooperation and "[did] not necessarily vitiate consent."  Patch, 142 N.H. at 459 (emphasis added).  We note, however, that the threats alleged here went beyond "a mere reference to the fact that [officers] could obtain a [search] warrant."  United States v. Ivy, 165 F.3d 397, 403 (6th Cir. 1998) (holding that defendant's consent was not voluntary under totality of circumstances when, among other things, officer made statements to the effect that he would arrest defendant's girlfriend and take away their small child if he did not consent, which "went far beyond a mere reference to the fact that he could obtain a [search] warrant"); cf. 4 LaFave, supra § 8.2(c), at 93-94 ("Consents given in response to a threat to seek a warrant have been upheld as voluntary (provided, of course, that in making the threat the police were not 'trading on' a prior Fourth Amendment violation)." (footnote omitted)).  To the extent the court ruled that these threats — even if they were actually made — could not, as a matter of law, vitiate consent, we disagree.  Cf. United States v. Bolin, 514 F.2d 554, 560-61 (7th Cir. 1975) ("In view of the fact that the defendant signed the consent form while undergoing custodial interrogation and only after he had been impliedly threatened that his girl friend would be arrested if he did not sign, we hold that the consent was involuntary and therefore invalid." (emphasis added)); United States v. Tibbs, 49 F. Supp. 2d 47, 48, 53 (D. Mass. 1999) (noting that, once officer indicated that he would obtain a search warrant, whereupon social services would take defendant's child into custody, if she did not consent, "there was no question that she would succumb [to signing consent form] — hardly voluntarily"); State v. Davis, 304 P.3d 10, 15 (N.M. 2013) (in determining voluntariness of defendant's consent, "[s]pecific factors indicating coercion include . . . threat of violence or arrest").

Nor did the trial court consider the impact, if any, that the illegal search had upon the voluntariness of the consent.  See 4 LaFave, supra § 8.2(d), at 113 ("Unquestionably, . . . a consent [to search] . . . is not voluntary . . . if the police in the course of an illegal search find certain incriminating evidence and then obtain the permission of the person in charge of the place searched to search the balance of that place.");  cf. State v. Bailey, 41 A.3d 535, 540 (Me. 2012) (holding that defendant's consent "was merely a resignation to police authority, not a voluntary act," when he signed consent form to search his apartment "minutes" after police conducted an illegal search of his computer that produced incriminating evidence).  In light of our holding that the pre-

9

consent search of the area surrounding the garage was unlawful under the Fourth Amendment, these findings are necessary to the ultimate determination as to whether, under the totality of the circumstances, "the [subsequent] consent was free, knowing and voluntary." Johnston, 150 N.H. at 453.

We therefore remand for the trial court to determine, in accordance with this opinion, whether the defendant gave "[a] voluntary consent free of duress and coercion" under the totality of the circumstances. Id. (quotation omitted). We emphasize that "the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality." Hight, 146 N.H. at 750 (emphasis added) (quotation omitted).

Vacated and remanded.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.