Hillsborough-northern judicial district
No. 2003-821

## THE STATE OF NEW HAMPSHIRE

### v.

### KENDALL M. WATSON

Argued: September 14, 2004
Opinion Issued: December 10, 2004

538

*Kelly A. Ayotte,* attorney general (*Craig S. Donais,* assistant attorney general, on the brief and orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. Following a bench trial in Superior Court (*Mangones,* J.), the defendant, Kendall M. Watson, was convicted of possession of marijuana with intent to sell. *See* RSA 318-B:2 (2004). The sole issue on appeal is whether the trial court erred in ruling that the defendant knowingly and voluntarily consented to the search of his hotel room. We affirm.

The record supports the following facts. At approximately 2:00 a.m. on July 28, 2001, Manchester Police Officer Garth Hamelin observed a red Ford Focus drive into the parking lot of the Econo Lodge hotel. The car was traveling at a high rate of speed toward the rear of the lot and narrowly missed striking a wall. Officer Hamelin followed the car to initiate a stop for reckless operation. Manchester Police Officer Kevin Covey, who was also in the parking lot, pulled in to assist. Officers Hamelin and Covey parked their police vehicles behind the car, making it impossible for the car to be moved.

When Officer Hamelin arrived in the rear parking lot, the driver of the car, the defendant, had already gotten out of the car and was walking toward the rear entrance of the hotel. Officer Hamelin ordered the defendant to stop and he complied. Officer Hamelin asked him for his license and registration. Officer Hamelin noticed that the defendant was "extremely nervous" and "smelled of an alcoholic beverage"; the defendant's eyes were bloodshot and his speech slurred. The defendant said he had consumed "four to six beers" and that he was driving his friend, Eric Sperry, home in the car Sperry rented because Sperry was too intoxicated. Suspecting that the defendant was intoxicated based on his demeanor, conduct and statements, Officer Hamelin administered two field sobriety tests. The defendant performed adequately, leading Officer Hamelin to believe he was under the influence of a narcotic or drugs,

instead of alcohol. The defendant denied using drugs and orally consented to a search of his person.

At some point during the conversation, Officer Hamelin asked the defendant why he was at the hotel. The defendant said that he originally had planned to spend the night with his girlfriend at the hotel but she had cancelled. The defendant said that he decided to stay at the hotel despite the cancellation because he already had paid for the room. Officer Hamelin asked the defendant why he was staying at the hotel when, according to his license, he lived "down the street." The defendant did not reply.

Meanwhile, Officer Covey ordered Sperry out of the car, retrieved a bag of marijuana from Sperry's pants pocket and placed him under arrest for possession of marijuana. After determining that Sperry had rented the car, Officer Covey obtained Sperry's consent to search it. In the trunk, the police found a large triple-beam scale, three boxes of Ziploc baggies, scissors and a box of latex disposable gloves with marijuana residue on the scale and gloves.

Officer Hamelin became concerned that there might be other individuals in the defendant's hotel room. The defendant was increasingly nervous, "vague with his answers," sweating, pale and shaking. Officer Hamelin asked the defendant whether there was anyone in the room, to which the defendant replied, "No." Officer Hamelin then asked the defendant if he would "mind if we go up and check." Officer Hamelin testified that the defendant replied, "No. I don't mind."

As they walked to the rear door of the building, the defendant said that he did not have a key to open the door. Officer Hamelin reminded the defendant that he had seen a key card in the defendant's wallet during the search minutes before. The defendant then took his wallet out, removed the key and used it to open the door.

They walked down the hallway and got into the elevator. Officer Hamelin asked the defendant what floor his room was on. At first, the defendant did not answer, but then said he did not know the floor. Officer Hamelin asked again and the defendant eventually told him.

When they got to the floor, Officer Hamelin asked the defendant for his room number. The defendant did not answer and just "stood there." According to Officer Hamelin, "He wasn't answering my questions any more. He wasn't talking. He was pale white." Officer Hamelin asked, "Is someone in the room?" The defendant did not answer. Eventually, the defendant led Officer Hamelin to the door of one of the rooms. Officer Hamelin could hear noise coming from inside the room. The noise, which turned out to be the television, elevated Officer Hamelin's concerns that

there were other people in the room. Officer Hamelin walked back down the hallway, called for a back-up unit and handcuffed the defendant.

Another officer arrived to stay with Sperry in the parking lot while Officer Covey went upstairs to assist Hamelin. Officer Hamelin, Officer Covey and the defendant went back to the door. They could still hear the television inside, prompting Officer Hamelin to ask the defendant: "Listen. Tell me right now. Is there somebody in that room that is going to jump out?" The defendant did not respond, but as Officer Hamelin started to open the door, the defendant said, "You are not going to like what you see."

Officer Hamelin opened the door and entered the room. On a counter he saw three lines of a white powdery substance and a rolled-up dollar bill. He also found a suitcase with "chunks of marijuana" and, under a comforter, large vacuum-sealed bags containing approximately thirty-two pounds of marijuana.

On appeal, the defendant argues that the trial court erred in ruling that he validly consented to the search of his hotel room. We disagree.

■ A voluntary consent free of duress and coercion is a recognized exception to the need for both a warrant and probable cause. *State v. Johnston*, 150 N.H. 448, 453 (2004). The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing and voluntary. *Id.* Voluntariness is a question of fact, based on the totality of the circumstances. *State v. Hastings*, 137 N.H. 601, 606 (1993). We will disturb the trial court's finding of consent only if it is not supported by the record. *State v. Hammell*, 147 N.H. 313, 318 (2001).

The defendant points to five factors to argue that his consent was not voluntary: (1) the heightened scrutiny accorded to one's dwelling; (2) the heightened scrutiny accorded to consent given by one in police custody; (3) the failure of the police to advise the defendant of his right to refuse consent; (4) the failure of the police to use a written consent to search form; and (5) the defendant's lack of cooperation with the police after consenting to the search.

■ We agree with the defendant that the privacy interest in a hotel room is comparable to that of the home, *see State v. Diaz*, 134 N.H. 662, 666 (1991); *see also Minnesota v. Olson*, 495 U.S. 91, 96, 99 (1990) (holding that "whether it be a hotel room, or the home of a friend," defendant's "status as an overnight guest is alone enough" to create a reasonable expectation of privacy), and that "the sanctity of the home is jealously guarded by a long line of cases," *Johnston*, 150 N.H. at 455. We also agree that, in some situations, the fact that the defendant is in custody may

weigh heavily against a finding of valid consent, *see United States v. Barnett*, 989 F.2d 546, 555 (1st Cir.), *cert. denied*, 510 U.S. 850 (1993), and that the use of a written consent form may be an important factor when evaluating the totality of the circumstances, *see Johnston*, 150 N.H. at 454. Likewise, we acknowledge that the failure of the police to advise the defendant of his right to refuse consent may be considered in determining the validity of his consent. *State v. Hight*, 146 N.H. 746, 751 (2001). Indeed, we have previously admonished that it is good policy for police officers to advise persons that they have a right to refuse to consent to a warrantless search. *Id.*

Nonetheless, our review of the record in this case reveals that these factors, either alone or in combination, do not demonstrate that the trial judge's finding of consent in this case is unsupported by the record. The record shows that while they were in the parking lot, the defendant was generally cooperative with the police. He consented to a search of his person. He submitted to field sobriety tests and, up to a point, responded to all questions asked by the police.

The record also shows that, although the defendant was not free to leave, he had not been placed under formal arrest. This is not a case in which consent was obtained in a post-arrest station house setting where the defendant may have been subject to coercive influences. *Cf. Barnett*, 989 F.2d at 555 (recognizing that "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody"). Nor is this a case where the procedure used by the police to obtain consent had a "potential for abuse." *See Johnston*, 150 N.H. at 455 (noting potential for abuse in the knock and talk procedure). Although advising a defendant of the right to refuse consent can be an important factor in finding that the State met its burden, *see, e.g., United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003), the failure to so warn the defendant in the circumstances here is not dispositive.

█ Here, the police made a straightforward request of the defendant to go upstairs and "check" his room. Officer Hamelin testified that the defendant replied, "No. I don't mind." The defendant does not argue that the request was preceded by an illegal search or deceptive activity and there is no evidence in the record that the police threatened the defendant.

Although the defendant argues that his lack of cooperation after he gave consent vitiated his consent, we agree with the trial judge that "[w]hile perhaps done unenthusiastically, the consent took place [and the] defendant did not revoke his consent to the search of the hotel room." *See, e.g., United States v. Cadieux*, 324 F. Supp. 2d 168, 170 (D. Me. 2004)

(recognizing that although consent may be revoked, the law generally requires an unequivocal act or statement of withdrawal).

Based upon our analysis of the totality of the circumstances, we hold that the trial court did not err when it ruled that the State met its burden of proving, by a preponderance of the evidence, that the defendant freely, knowingly and voluntarily consented to the search of his hotel room.

*Affirmed.*

DALIANIS and GALWAY, JJ., concurred; BRODERICK, C.J., concurred specially; NADEAU, J., concurred specially.

BRODERICK, C.J., concurring specially. I concur with the majority's holding that, based upon an analysis of the totality of the circumstances in this case, the trial court did not err in ruling that the State had met its burden of proving that the defendant freely, knowingly and voluntarily consented to the search of his hotel room. I write separately, however, because I disagree with the majority when it states in dicta: "We agree with the defendant that the privacy interest in a hotel room is comparable to that of a home . . . ."

Because our standard of review in this case involves the totality of circumstances concerning the defendant's consent, the precise nature of his privacy interest in his hotel room is not at issue here. Indeed, I fully agree that a "review of the record in this case reveals that these factors [including the defendant's privacy interest in his hotel room], either alone or in combination, do not demonstrate that the trial judge's finding of consent in this case is unsupported by the record." Whether the privacy interest in a hotel room is comparable to that of the home, or diminished from it—and if so, to what extent—remains an undecided issue in this State. This case neither requires nor lends itself to its resolution. In light of the majority's dicta, however, I write to express my opinion that there is a diminished expectation of privacy in a hotel or motel room from that of the home.

I fully agree that a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures under both the Fourth Amendment to the Federal Constitution and Part I, Article 19 of the State Constitution. *See, e.g., Stoner v. California,* 376 U.S. 483, 490 (1964); *Hoffa v. United States,* 385 U.S. 293, 301 (1966). That, however, is not the end of the analysis. Instead, we must turn to *Katz v. United States,* 389 U.S. 347, 353 (1967), which established the "expectation of privacy" rationale as the touchstone governing the scope of Fourth Amendment protection. *See United States v. Mankani,* 738 F.2d 538, 542 (2d Cir. 1984).

In *State v. Goss*, 150 N.H. 46 (2003), we acknowledged the reasonable expectation of privacy analysis under the Fourth Amendment to the Federal Constitution and explicitly adopted the same under Part I, Article 19 of our State Constitution. We stated:

> Our State Constitution protects all people, their papers, their possessions and their *homes* from unreasonable searches and seizures. It particularly protects people from unreasonable police entries into their *private homes*, because of the heightened expectation of privacy given to one's dwelling. . . .
>
> . . . .
>
> . . . We believe the most cogent articulation of that analysis was supplied by Justice Harlan in his concurrence in *Katz* . . . : "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as reasonable." We therefore adopt Justice Harlan's two-part test under Part I, Article 19.

*State v. Goss*, 150 N.H. 46, 48-49 (2003) (emphasis added; citations and quotations omitted).

Consequently, the majority's dicta presumes that society is prepared to recognize as reasonable that the expectation of privacy in a hotel or motel room is the same as that in a person's private home. I do not share that presumption.

> [I]t is not the common hallway, entryway or passage alone that diminishes one's reasonable expectation of privacy in a hotel or motel room. Instead, it is the fact that hotels, as opposed to residences, are truly transitory places. Unlike an apartment or a room in a boarding house, hotels and motels are not ordinarily considered places where one lives and keeps personal effects. In addition, service personnel in hotels and motels have keys to enter and make-up the rooms, remove dishes, check air-conditioning, heating and the like. Former occupants may even have retained a key to a hotel room. . . .
>
> In short, it is the transitory nature of such places, commonly understood as such, that diminishes a person's justifiable expectation of privacy in them. Since a hotel room is exposed to others, it is unlike a "house," *i.e.*, a place where one lives.

> Therefore, there is an accepted loss of privacy when one occupies a public place . . . .

*United States v. Mankani,* 738 F.2d at 544 (citations omitted).

As understandable as the desire for privacy in an individual's hotel or motel room may be, "it is not conclusive of society's willingness to recognize . . . as reasonable" that the expectation of privacy is the same as that in one's own home. *Goss,* 150 N.H. at 51 (Broderick, J., dissenting) (quotation omitted). Although most people would probably prefer that their reasonable expectation of privacy were the same in these two places, that expectation is not consistent with everyday life experience. *See id.*

NADEAU, J., concurring specially. The majority concludes that the defendant, while seized, was not in custody. In dicta, the majority notes that "the fact that the defendant is in custody may weigh heavily against a finding of valid consent and that the use of a written consent form may be an important factor when evaluating the totality of the circumstances." (Citations omitted.)

I concur with the majority that the record supports the trial court's finding of consent. Given the absence of custody, however, I believe the majority's dicta does not foreclose the court from holding, in a future case, that unless the police advise a person *in custody* of the right to refuse consent to search, the consent is *per se* involuntary.