Carroll
No. 2004-859

THE STATE OF NEW HAMPSHIRE

v.

DAVID LIVINGSTON

Argued: January 12, 2006
Opinion Issued: April 25, 2006

400

*Kelly A. Ayotte*, attorney general (*Peter C.L. Roth*, senior assistant attorney general, on the brief and orally), for the State.

*Barry S. Weinstein*, of Manchester, on the brief and orally, for the defendant.

GALWAY, J. The defendant, David Livingston, was convicted of possession of a controlled drug, RSA 318-B:2, I (2004); RSA 318-B:26, II(a) (Supp. 2005), and misdemeanor possession of drugs, RSA 265:80 (2004). On appeal, he argues that the Superior Court (*O'Neill*, J.) erred in denying his motion to suppress evidence seized during a search of his motor vehicle. We affirm.

After an evidentiary hearing, the trial court found the following facts. On October 20, 2003, the defendant was driving a dual-axle truck, bearing Massachusetts Commercial License plates, on Route 302 in Center Conway. Officer Nathan Boothby of the New Hampshire Bureau of Highway Patrol Enforcement stopped the defendant's truck to perform a routine commercial vehicle inspection pursuant to RSA 266:72-a, I (2004) and 49 C.F.R. § 390 (2005). Boothby approached the truck to question the defendant to determine whether the truck constituted a commercial vehicle under the federal motor carrier safety regulations.

As Boothby approached the vehicle, he smelled a strong odor of burnt marijuana coming from inside it. He also observed that the defendant's eyes were bloodshot and he appeared to be nervous. Boothby initially asked the defendant routine questions to determine whether the defendant's vehicle came within the scope of the federal motor carrier safety regulations. After determining that it did not, Boothby told the defendant that he smelled burnt marijuana, and asked him whether he had any marijuana in the truck or on his person. The defendant responded, "No." Boothby asked him to consent to a search of the vehicle. The defendant refused, stating that he did not feel that he had any options.

Boothby explained to the defendant that he could refuse to consent to a search, in which case Boothby would have a trained dog perform a canine sniff search of the exterior of the vehicle; if the dog indicated the presence of narcotics, Boothby would seize the vehicle and apply for a search warrant. The defendant asked if the search could be conducted by looking into the vehicle from the outside. Boothby indicated that he was not requesting the defendant's consent to perform that kind of search.

At some point, Boothby asked the defendant to get out of the truck. The officer then gave the defendant a written consent form. Boothby explained

the consent form and watched as the defendant appeared to read it. At the hearing, the defendant testified that he verbally limited the scope of his consent to a "reasonable search" lasting "two or three minutes." Boothby, however, testified that the defendant never indicated that he wanted to limit the scope of the search of the vehicle. The defendant signed the consent form without any conditions or limitations.

Boothby conducted a canine search of the interior and exterior of the vehicle and found a burnt marijuana cigarette in the driver's side door. Boothby then placed the defendant under arrest. During a subsequent search incident to the arrest, Boothby discovered a baggie containing cocaine in the defendant's pocket.

The defendant moved to suppress the burnt marijuana cigarette and the cocaine. After conducting an evidentiary hearing at which the defendant and Boothby testified, the trial court found that Boothby had the authority to conduct a routine inspection of the defendant's vehicle pursuant to RSA 266:72-a and 49 C.F.R. § 396.9(a). Concluding that Boothby "testified credibly," the trial court also found that the defendant signed a valid consent to search form, which was not the product of coercion. The court denied the motion to suppress the marijuana cigarette and cocaine.

On appeal, the defendant argues: (1) the stop of his vehicle was unconstitutional because it did not fall within the administrative search exception to the warrant requirement and was pretextual in nature; (2) the search of his vehicle was made without his voluntary consent; and (3) to the extent he gave limited consent to search his vehicle, Boothby exceeded the scope of that consent. The defendant invoked the protections of Part I, Article 19 of the State Constitution and the Fourth and Fourteenth Amendments to the United States Constitution.

"Our review of the superior court's order is *de novo*, except as to any controlling facts determined at the superior court level in the first instance. We defer to the trial court's determinations of credibility unless no reasonable person could have come to the same conclusion after weighing the testimony." *State v. Hammell*, 147 N.H. 313, 317 (2001) (quotations and citations omitted). We first address the issues under the State Constitution and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

*I. Legality of the Stop*

A warrantless search is *per se* unreasonable and invalid unless it comes within one of the recognized exceptions to the warrant requirement. *State v. Seavey*, 147 N.H. 304, 306 (2001). One such exception is the administrative search exception. *State v. Plante*, 134 N.H. 585, 588 (1991). A warrantless administrative search is reasonable if: (1) there is a

"substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) the warrantless inspection is necessary to further the regulatory scheme; and (3) the implementation of the statutory inspection program provides a constitutionally adequate substitute for a warrant. *State v. Turmelle*, 132 N.H. 148, 153 (1989) (citations and quotations omitted); *see New York v. Burger*, 482 U.S. 691, 702-03 (1987).

RSA 266:72-a, I (2004) grants the commissioner of safety authority to adopt "the current version of the federal motor carrier safety regulations promulgated by the U.S. Department of Transportation, Federal Highway Administration, Bureau of Motor Carrier Safety, contained in 49 C.F.R. 107, 382, 385-397." The federal motor carrier safety regulations authorize agents to perform routine inspections of commercial motor vehicles. *See* 49 C.F.R. § 396.9(a). These regulations define a "commercial motor vehicle" as, in pertinent part:

> any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle
>
> (1) Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater . . . .

49 C.F.R. § 390.5 (2005).

Here, the defendant does not dispute that a routine commercial motor vehicle inspection, if properly conducted pursuant to the applicable federal motor carrier safety regulations, constitutes a reasonable administrative search. Nor does he dispute that Boothby had the authority to conduct a routine commercial motor vehicle inspection pursuant to the federal motor carrier safety regulations. Rather, the defendant argues that when Boothby stopped the defendant's vehicle, he exceeded his authority because the vehicle was under the minimum weight requirement, and, therefore, was not a commercial motor vehicle. In addition, the defendant contends that Boothby exceeded his authority by continuing to detain and question the defendant after learning that his vehicle was not a commercial motor vehicle. We disagree.

Boothby testified that when he stopped the defendant's vehicle, he reasonably believed that it was a commercial motor vehicle for the purposes of the federal motor carrier safety regulations. He also testified that: (1) the defendant was driving a truck bearing Massachusetts license plates designating it as a commercial vehicle; and (2) he estimated the

vehicle's weight as being "in the ballpark of" the minimum weight requirement of 10,001 pounds. In addition, Boothby observed that the defendant's vehicle was a "heavier" dump truck, with a large wooden structure, which is primarily used for commercial wood chipping, over the bed of the truck. The trial court found Boothby's testimony to be credible. Based upon the trial court's findings, we conclude that Boothby's stop of the vehicle was reasonable and fell within the scope of the administrative search exception.

■ There is no reasonable way for an officer, who is stopping a suspected commercial motor vehicle for the purpose of conducting a routine inspection, to know the exact weight of that vehicle prior to obtaining that information from either the driver or the vehicle registration. Thus, when an officer, based upon observations and circumstances, reasonably believes that a vehicle falls within the weight requirements of the federal motor carrier safety regulations, a stop of the vehicle is valid to determine whether it qualifies as a commercial motor vehicle under the pertinent regulations. In this context, the defendant urges us to narrowly construe RSA 266:72-a, I, and 49 C.F.R. § 390 and rule that any stop of a motor vehicle under the minimum weight requirement is unreasonable as a matter of law. We decline to do so. Such a conclusion would undermine the underlying purpose of the federal motor carrier safety regulations, which is to promote motor carrier safety.

■ Having concluded that the initial stop of the defendant's vehicle was valid under the administrative search exception to the warrant requirement, we next consider whether Boothby exceeded the scope of his authority when he questioned the defendant after learning the vehicle was not a commercial motor vehicle. The defendant argues that as soon as Boothby ascertained that his vehicle did not qualify as a commercial motor vehicle, Boothby lacked authority to further question him under the administrative search exception. A temporary detention is lawful, however, "if the police have an articulable suspicion that the person detained has committed or is about to commit a crime." *State v. McKinnon-Andrews*, 151 N.H. 19, 22 (2004) (quotations and citations omitted); *see Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable articulable suspicion refers to suspicion based upon specific, articulable facts taken together with rational inferences from those facts. *State v. Hight*, 146 N.H. 746, 748 (2001). To be constitutional, a *Terry* stop must be carefully tailored to its underlying justification and must be temporary, lasting no longer than is necessary. *McKinnon-Andrews*, 151 N.H. at 23.

■ In this case, as Boothby approached the defendant's vehicle, he smelled a strong odor of burnt marijuana coming from inside it. Boothby also observed that the defendant appeared to be nervous and had bloodshot eyes. Given the trial court's finding that Boothby's testimony was credible, we hold that he had reasonable articulable suspicion that the defendant had been, or was about to be, engaged in criminal activity when Boothby initially approached the vehicle and began conversing with the defendant. *See Hight*, 146 N.H. at 748 (explaining reasonable articulable suspicion). While Boothby's authority to detain the defendant under the administrative search exception ended when he looked at the vehicle registration and ascertained that the vehicle was not a commercial vehicle, we conclude that Boothby had reasonable suspicion to detain the defendant and question him regarding the presence of marijuana in his vehicle.

Because the Federal Constitution affords no greater protection than the State Constitution in these areas, *see State v. Turmel*, 150 N.H. 377, 382 (2003); *Terry*, 392 U.S. at 20-21, we reach the same result under the Federal Constitution as we do under the State Constitution.

## II. Voluntariness of the Consent

The defendant next argues that the search of his vehicle was made without his voluntary consent. He asserts he was intimidated by Boothby's questions and actions, and confused as to the nature of Boothby's request for a search.

■ "A voluntary consent free of duress and coercion is a recognized exception to the need for both a warrant and probable cause." *State v. Watson*, 151 N.H. 537, 540 (2004). The State bears the burden of proving, by a preponderance of the evidence, that the consent was free, knowing and voluntary. *Id.* The voluntariness of the consent is a question of fact determined by examining the totality of the circumstances. *Id.*; *State v. Johnston*, 150 N.H. 448, 453 (2004). We will disturb the trial court's factual findings only if they are unsupported by the record or are clearly erroneous. *McKinnon-Andrews*, 151 N.H. at 22. Our review of the trial court's legal conclusions, however, is *de novo. Id.*

In *State v. Prevost*, 141 N.H. 647 (1997), we addressed the voluntariness of a driver's consent to search her vehicle in circumstances similar to the instant case. In that case, a police officer stopped the vehicle and instructed the driver to get out of the car. *Id.* at 649. Once outside of the vehicle, the driver initially consented to a search of her vehicle but subsequently interrupted the police officer as he read the consent to search form and requested an attorney. *Id.* The officer then informed her

that the police were going to tow the vehicle and apply for a search warrant. *Id.* After being told that she could not leave because they were going to have her car towed, the driver signed a written consent to search her vehicle. *Id.*

We recognized that the trial court reasonably found that the police officer's testimony supported the conclusion that "[the driver] .appeared neither scared, upset, nor intimidated during the police stop." *Id.* at 650. We concluded that the police officer's statement regarding having the vehicle towed was "explanatory rather than coercive in nature" and the trial court reasonably found that the driver's questions and reservations were satisfactorily resolved, resulting in a voluntarily signed consent form. *Id.*

Similarly, in *State v. Patch*, 142 N.H. 453 (1997), the defendant initially refused to consent to a search of his vehicle. *Patch*, 142 N.H. at 454. However, after the police officers "informed the defendant that they knew what was in the trunk," the defendant opened the trunk, removed a bag of marijuana, gave it to the police officers, and then consented to a search of the rest of the vehicle. *Id.* at 458. The police officers then asked the defendant if he would accompany them to recover marijuana that was stored at another residence. *Id.* at 454. The defendant asked what would occur if he did not comply and the police officer told him that they would contact the homeowner at work and obtain a search warrant. *Id.* at 454-55.

 We affirmed the trial court's determination that the defendant voluntarily consented to both the search of his vehicle and the search of the other residence. *Id.* at 458-59. Informing a defendant of viable alternatives to a consent search "does not necessarily vitiate consent." *Id.* at 459. Additionally, "prior refusal does not necessarily invalidate a subsequent consent as involuntary." *Id.* (citation omitted). Thus, based upon the totality of the circumstances, we affirmed the trial court's finding that there was no suggestion of intimidation, coercion, or other unlawful police action. *Id.* at 458. We noted that: (1) it was the extent of the officer's knowledge that caused the defendant to change his position regarding the search of the trunk of the vehicle; and (2) the police officer's explanation that they would contact the homeowner at work and obtain a search warrant for the residence was a "realistic alternative available to [the police]." *Id.* at 459.

Here, the trial court found that the State met its burden of proving that the defendant's consent was free, knowing, and voluntary. At the hearing, Boothby testified that after the defendant denied having any marijuana in the truck or upon his person, he asked the defendant for consent to search the vehicle. Boothby testified that the defendant "said no, that he (the

defendant) didn't feel that he had any options." When asked what he did next, Boothby stated:

> I explained that he (the defendant) did have options, that he could refuse the search and I had a drug detection odor canine dog with me in my cruiser. If I ran the dog, meaning conducting a search of the exterior of his vehicle with the dog, and he responded to the odor of narcotic as he had been trained, then I would be seizing the vehicle and applying for a search warrant.

Boothby then testified that the defendant moved some items that were located inside the vehicle and asked Boothby whether he could "just look from where [Boothby] was standing." Boothby declined, asked the defendant to exit the vehicle, and the defendant then gave him a written consent. The trial court found that Boothby testified credibly. It also relied upon the fact that Boothby "gave the defendant a consent form, and watched the defendant's eyes follow the form as if he were reading it." The defendant signed the consent form as presented, without limitations or conditions. While recognizing that Boothby did not recall whether the defendant was wearing glasses at the time he was presented with the consent form, the trial court found that "it is undisputed that the defendant did not indicate he did not understand the form or that he was having difficulty reading it."

In the instant case, the record supports the trial court's determination, based upon the totality of the circumstances, that the defendant's consent was voluntary. The defendant's initial refusal was accompanied by a statement indicating that he thought that he had no other options available to him. Boothby's response both informed the defendant that he could continue to refuse to consent to a search of the vehicle as well as explained the alternative procedures that would ensue should the defendant choose to do so. Therefore, in response to his own inquiry, the defendant was informed that his refusal to consent to a search of his vehicle would result in a canine sniff search of the vehicle's exterior, which, if positive, would lead to Boothby applying for a warrant to search the vehicle. Thus, similar to *Prevost*, the trial court concluded that Boothby's response was explanatory rather than coercive. *See Prevost*, 141 N.H. at 650; *Patch*, 142 N.H. at 459.

Furthermore, similar to the driver in *Prevost*, the defendant was asked to exit the vehicle before the written consent to search form was reviewed and before signed consent to search the vehicle was given. As in *Prevost*, we cannot conclude that either the defendant's exit from the vehicle or his prior refusal invalidated his subsequent consent as

involuntary. *Prevost*, 141 N.H. at 649; *see Patch*, 142 N.H. at 459. Moreover, like the trial court in *Patch*, the trial court in this case found the police officer's testimony to be more credible than the defendant's testimony. *See Patch*, 142 N.H. at 458. We defer to the trial court's determination on credibility unless no reasonable person could have come to the same conclusion after weighing the testimony. Here, the record supports the trial court's finding. *See Hammell*, 147 N.H. at 317.

Thus, we conclude that the record supports the trial court's finding that the defendant's consent was freely, knowingly, and voluntarily given based upon the totality of the circumstances. *See McKinnon-Andrews*, 151 N.H. at 22. Because the Federal Constitution affords no greater protection than the State Constitution in these areas, *see Prevost*, 141 N.H. at 650; *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (holding that consent must be freely and voluntarily given), we reach the same result under the Federal Constitution as we do under the State Constitution.

### III. The Scope of the Consent

The defendant argues that his consent to search the vehicle was subject to specific limitations, and that the search was invalid because it exceeded the scope of his consent. We disagree.

Boothby testified that the defendant did not place any limitations or conditions, either verbally or in writing, on his consent to search the vehicle. No such limitations appear in the written consent form that was signed by the defendant. While the defendant testified to the contrary, we defer to the trial court's determination of credibility. Because a reasonable person could have come to the same conclusion as did the trial court after weighing the testimony, *Hammell*, 147 N.H. at 317, we will not disturb the trial court's finding that the defendant did not limit the scope of the search of his vehicle.

To determine whether a search has exceeded the scope of the permission granted, we ask whether under the circumstances surrounding the search, it was objectively reasonable for the officers conducting the search to believe that the defendant had consented to it. *State v. Szczerbiak*, 148 N.H. 352, 357 (2002). Where the trial court found that the defendant did not limit the scope of the search, we hold that a reasonable person would determine that Boothby did not exceed the scope of the consent granted by the defendant.

Because the Federal Constitution offers no greater protection than does the State Constitution with respect to the scope of a consent search, *see*

*id.*; *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), we reach the same result under the Federal Constitution.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, J., concurred; DUGGAN, J., dissented.

DUGGAN, J., dissenting. I agree that we should affirm the trial court's ruling that the stop of the truck was justified and that the defendant did not limit the scope of the consensual search. However, I would reverse the trial court's ruling that the defendant's consent was voluntary.

Officer Boothby testified at the suppression hearing that as he approached the truck, the defendant put his window down and Officer Boothby "could smell a strong odor of burnt marijuana coming from inside of the vehicle." He observed that the defendant "was nervous and his eyes were bloodshot." Officer Boothby first asked the defendant questions to determine whether the vehicle was within the federal motor carrier safety regulations. He also asked the defendant who he was working for and whether he was being compensated. The defendant answered that he was working for his family at his camp in Brownfield constructing a concrete slab.

Officer Boothby then told the defendant that he smelled marijuana, and asked him if he had any marijuana in the truck or on his person. The defendant responded at first with "a blank stare" and then said, "[N]o." Officer Boothby asked for consent to search the vehicle. The defendant said, "[N]o," but indicated "that he didn't feel that he had any options."

Officer Boothby "explained that he did have options, that he could refuse the search." Officer Boothby explained that, if the defendant refused the search, the officer "had a drug detection odor canine dog with [him] in [his] cruiser. If [he] ran the dog, meaning conducting a search of the exterior of [the] vehicle with the dog, and he responded to the odor of narcotic as he had been trained, then [Officer Boothby] would be seizing the vehicle and applying for a search warrant."

As Officer Boothby explained this canine search procedure, the defendant appeared "very anxious" and seemed to want the search to be brief. The defendant then "moved some jackets and other things that were inside the vehicle and asked [Officer Boothby] if [he] could just look from where [he] was standing." Officer Boothby stated that was not "acceptable to [him]."

At some point, Officer Boothby asked the defendant to get out of the truck. Outside, behind the truck and in front of the cruiser, Officer Boothby gave the defendant a consent form. Officer Boothby explained the form "[f]rom top to bottom," including "what [he was] asking to search"

and "that [the defendant] [did] not have to give [him] consent." The defendant, appearing "nervous," read the form and signed it.

Officer Boothby then called for another officer to assist him. After the other officer arrived, Officer Boothby searched the truck, found the marijuana and arrested the defendant for transporting drugs. In the defendant's pocket, he found a baggie containing cocaine.

A voluntary consent is a recognized exception to the requirement for either a warrant or probable cause. *State v. Watson*, 151 N.H. 537, 540 (2004). Whether the consent was in fact voluntary or was, rather, the product of coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *State v. McGann*, 124 N.H. 101, 105-06 (1983). The burden is on the State to prove voluntariness by a preponderance of the evidence. *Watson*, 151 N.H. at 540. "Moreover, submission to a search does not constitute consent." *State v. Pinder*, 126 N.H. 220, 224 (1985). We will disturb the trial court's finding of consent if it is not supported by the record. *Watson*, 151 N.H. at 540.

In *State v. Patch*, 142 N.H. 453, 459 (1997), the defendant "asked the officers what they would do if he refused to cooperate, [and the officers] told him that they would apply for a search warrant." We said that "[i]nforming the defendant of viable alternatives . . . does not necessarily vitiate consent." *Id.* at 459. Thus, *Patch* did not hold that "[i]nforming the defendant of viable alternatives" is an acceptable police practice, but rather held that the practice "does not necessarily vitiate consent." *Id.*

Other courts have recognized that telling the defendant that his refusal to consent to a search will result in a canine search of the car is a critical factor in considering whether any subsequent consent is involuntary. In *State v. Woolfolk*, 3 S.W.3d 823, 832 (Mo. Ct. App. 1999), where the defendant "repeatedly indicated he did not want the trooper to search [his] car, [the trooper] required [the defendant] to get out of his car and told him he had two . . . options: he could either allow the search, or he could wait for the canine unit to search." The court held that his "alleged consent to search his car was merely a submission to lawful authority." *Id.* Similarly, in *Rouse v. State*, 643 So. 2d 696, 698 (Fla. Dist. Ct. App. 1994), the court acknowledged that "it [could not] be said that [the defendant] voluntarily consented to be searched under circumstances in which the consent only occurred after the defendant was advised that the K-9 unit would be called to conduct a sniff check." *See also Monroe v. State*, 578 So. 2d 847, 848-49 (Fla. Dist. Ct. App. 1991) (defendant's written consent was not voluntary where the police "threatened to call a canine unit and stated that they would stay there until they were able to search the trunk"); *State v. Lanxon*, 393 So. 2d 1194, 1194-95 (Fla. Dist. Ct. App. 1981) (defendant's consent was not voluntary where officer approached defendant at an

airport and, when defendant refused to consent to a search of her luggage, told her he would "contact a Narcotics Unit at [her] destination and request that a narcotics detection dog sniff [her] luggage" (quotation omitted)).

This case is thus not governed solely by *Patch*. Here, the defendant submitted to a search only after the officer indicated that a search would be conducted regardless of the defendant's refusal to consent. The officer effectively told the defendant that he had the authority, without the defendant's consent, to conduct a canine sniff and then seize the truck and search it pursuant to a warrant. The officer went beyond merely providing information to making clear that the defendant's refusal to consent would not be honored. Submission to a search in the face of such an assertion does not constitute voluntary consent.

Moreover, by the time the defendant signed the consent form, the officer had asked the defendant to get out of the truck. In *Watson*, 151 N.H. at 540-41, we recognized "that, in some situations, the fact that [a] defendant is in custody may weigh heavily against a finding of valid consent." In this particular situation, getting the defendant out of the truck communicated a clear message to the defendant—that the detention would continue as long as necessary for a search to be conducted. *See Monroe*, 578 So. 2d at 848. On these facts, therefore, the detention of the defendant weighs heavily against a finding of voluntary consent.

Finally, while the defendant's initial refusal to consent to the search does not, standing alone, invalidate his subsequent consent, *see State v. Green*, 133 N.H. 249, 259 (1990), it should carry more weight in the analysis of the voluntariness of his consent than a mere passing reference. At least one court has recognized that "an initial refusal is an important factor in assessing whether a subsequent consent is voluntary." *People v. Cardenas*, 604 N.E.2d 953, 956 (Ill. App. Ct. 1992). Making an initial refusal "important" is consistent with the settled law regarding custodial interrogation. There, if a person in custody "exercises his option to cut off questioning, the police must scrupulously honor the suspect's desire to remain silent," *State v. Laurie*, 135 N.H. 438, 442 (1992), and, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *State v. Plch*, 149 N.H. 608, 613 (2003) (quotation omitted). Similarly, here, the defendant's initial refusal to consent to the search should be given significant weight in assessing the voluntariness of his subsequent consent.

While it is true that the officer here advised the defendant of his right to refuse to consent and the defendant signed a consent form, these facts are insufficient to overcome the coercion implicit in the circumstances. "[T]he fact that a written consent form was signed is not dispositive when

circumstances show that the signature was obtained by coercion." *Cardenas*, 604 N.E.2d at 956. By the time the form was signed, the defendant could only conclude that not signing was not a viable alternative. The inevitability of the search was obvious and thus, given the totality of the circumstances, the consent was not voluntary.

The majority relies upon *State v. Prevost*, 141 N.H. 647 (1997). There, after the defendant was involved in a physical confrontation with his former probation/parole officer and then pursued by local police, the defendant was placed in custody and the police sought to search the vehicle in which he had been a passenger. *Id.* at 648-49. However, prior to obtaining the driver's consent to search the vehicle, the police "explained to [the driver] that [they] were going to tow her vehicle and apply for a search warrant." *Id.* at 649. Without any discussion or analysis, we affirmed the trial court's conclusion that the police officer's "statement about having the car towed was explanatory rather than coercive in nature." *Id.* at 650.

Moreover, although *Prevost* shares some facts similar to those present in this case, there exist additional facts in each case that distinguish the two. In *Prevost*, the officers testified that the driver "appeared neither scared, upset, nor intimidated during the police stop" and "did not hesitate" in signing the consent form "shortly" after "her questions and reservations [had been] satisfactorily resolved" by the officer's explanation of the alternative to a consent search. *Id.* at 649, 650. Here, however, the officer testified that, when he approached the defendant's vehicle, the defendant appeared "nervous." He also testified that the defendant appeared "very anxious" during the course of the encounter and was "nervous" when given the consent form. Furthermore, the officer's testimony was that throughout the encounter, and even after he fully explained to the defendant the alternative to a consent search, the defendant hesitated in giving his consent. When Officer Boothby inquired about the presence of marijuana, the defendant responded with "a blank stare." After Officer Boothby told the defendant that his refusal to consent to a search would result in a canine search of the car, the defendant asked if the search could be conducted by simply looking in from the outside of the vehicle, after which some time elapsed and the officer asked the defendant to exit the vehicle, and then, only after exiting the vehicle, the defendant considered giving his consent. These distinctions are significant in considering the totality of the circumstances in this case as demonstrating that the defendant's consent was not voluntary.

Of course, given the strong odor of burnt marijuana, it is completely understandable that Officer Boothby persisted in seeking consent to search the truck. The odor of marijuana, while irrelevant to the issue of

consent, gave Officer Boothby sufficient justification to detain and probably arrest the defendant. *See generally Johnson v. United States*, 333 U.S. 10, 13 (1948); *State v. Whiting*, 127 N.H. 110, 111-12 (1985). The State, however, has not argued the applicability of any exceptions to the warrant requirement, other than consent, or any exceptions to the exclusionary rule, to justify the admissibility of the evidence.