Portsmouth District Court
No. 2005-938

# THE STATE OF NEW HAMPSHIRE

v.

## MICHAEL A. HUNT & a.

Argued: February 27, 2007
Opinion Issued: May 25, 2007

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Law Office of Mark Stevens*, of Salem (*Mark Stevens* on the brief), for defendant Jennifer Dahlen, and (*Mr. Stevens* orally), for all defendants.

*Jeffco, Starbranch & Soldati*, of Portsmouth (*Harry N. Starbranch, Jr.* on the brief), for defendants Michael A. Hunt and Merle Wilbur.

*Hanlon & Zubkus*, of Rochester, for defendant James A. Dickson, joins in the brief of defendant Jennifer Dahlen.

*Meade & Loring, PC*, of Portsmouth, for defendant William Ballard, joins in the brief of defendant Jennifer Dahlen.

BRODERICK, C.J. In these consolidated appeals, the State challenges an order of the Portsmouth District Court (*DeVries*, J.) ruling that a sobriety checkpoint operated by the Portsmouth Police Department (PPD) was unconstitutional, suppressing evidence collected at the checkpoint, and dismissing charges of driving while under the influence (DWI), *see* RSA 265:82 (2004), against defendants Michael A. Hunt, Jennifer Dahlen, James A. Dickson, William Ballard and Merle Wilbur. We reverse and remand.

I

The relevant facts are not in dispute. At approximately 3:00 p.m. on Tuesday, July 5, 2005, Michael J. Magnant, Chief of the PPD, petitioned the Rockingham County Superior Court to authorize a sobriety checkpoint during the late-night and early-morning hours of Friday and Saturday, July 8 and 9, as well as Saturday and Sunday, July 9 and 10. The petition included an affidavit from Chief Magnant, a sobriety checkpoint operational plan, a press release dated July 6, 2005, and a proposed order.

In his petition, Chief Magnant referred to the guidelines adopted by the attorney general's office for sobriety checkpoints which, in his words, call for "the achievement of maximum deterrent effect through aggressive public information efforts and advanced publicity." Regarding the public information efforts the PPD proposed to undertake, the petition recited that "[t]he proposed sobriety checkpoint plan in this case calls for a detailed press release that [would] be sent to many press agencies throughout the State [and that] ample signs warning motorists that they [were] entering the checkpoint [would] be set up well in advance of any

motor vehicles being stopped." In his affidavit, Chief Magnant explained the broader context of the proposed sobriety checkpoint:

> Year-round, my officers conduct alcohol compliance checks in stores and taverns in the city. We also conduct random "DWI-Hunter" saturation patrols, and most recently we have conducted impaired driver training for police officers that emphasizes the use of a Drug Recognition Expert (DRE) to screen out operators under the influence of drugs. All of these initiatives carry with them heightened media attention and a clear message to the public that we do not tolerate alcohol/drug-impaired drivers.

> With the summer season coming and the influx of tourists frequenting our drinking establishments now is the time for a well publicized sobriety checkpoint. . . . These checkpoints will be compl[e]mented by Statewide DUI saturation patrols conducted by bordering agencies.

The PPD operational plan, in turn, stated: "Sufficient warning signs [would] be placed ahead of the checkpoint to provide advance notice for oncoming vehicles. The Police Department's illuminated sign trailer [would] display the necessary messages." The plan further provided that "[a]dvanced notification of sobriety checkpoints [would] be announced to the media by the Chief-of-Police and the day of the checkpoint and a general location [would] be disclosed."

At 8:55 a.m. on Thursday, July 7, the superior court granted Chief Magnant's petition after finding that "the conduct of such sobriety checkpoints [would] significantly advance the public interest in a manner which outweighs any accompanying intrusion on individual rights[,] . . . that there are no less intrusive means available to accomplish the goal of such checkpoints . . . [and that] [t]here should be a significant deterrent effect in the event this sobriety checkpoint authorization is implemented."

After the superior court authorized the checkpoints, the PPD distributed its press release to local media. On Friday, July 8 it appeared in *Foster's Daily Democrat*. Thereafter, the PPD operated the checkpoint in accordance with the operational plan submitted to the superior court. The five defendants in this case were all arrested at the checkpoint and charged with DWI.

Before the trials of defendants Hunt and Dahlen, the prosecutor in each case filed a motion *in limine* asking the trial court to admit evidence collected as a result of the traffic stops that led to the defendants' arrests. Hunt and Dahlen both moved to suppress the evidence collected at the PPD checkpoint, arguing that when they were stopped at the checkpoint,

they were seized in violation of their rights under the State and Federal Constitutions. In addition, Hunt moved to dismiss the charges against him, arguing, among other things, that the superior court's warrant authorizing the PPD checkpoint was defective on its face and that the statistical information the PPD supplied the superior court did not support the court's issuance of a warrant. After holding two hearings in Hunt's case and one in Dahlen's case, the district court suppressed the evidence collected at the checkpoint and dismissed the charges against all five defendants. The district court ruled, in relevant part:

> The evidence in this case establishes that in actuality, *no* aggressive advance notice to the public or envisioned advance publicity of this proposed sobriety checkpoint took place.
>
> . . . .
>
> According to the State, the evidence of compliance with the advance publicity alleged in its petition consisted of signage at the checkpoint site, one article printed in Foster's [Daily Democrat] on the afternoon of 7/8/05 (a newspaper whose circulation is primarily to the Dover/Rochester areas), and a press release sent or faxed to various media on 7/7/05. No other published information was furnished, no evidence of the type specified in the attorney general's guidelines produced.
>
> . . . .
>
> To justify the intrusion [occasioned by a sobriety checkpoint], there must be a reasonable minimal intervention. What may make it reasonable, *inter alia*, is that the public knows about it in advance, a less intrusive method than what was used here and what is the recommended protocol by the head law enforcement agency in the State. See, also, *Opinion of the Justices* [128 N.H. 14 (1986)].
>
> Whether this Petitioner is bound by the protocols of the attorney general does not in hindsight excuse the failure to follow those protocols. The State chose to rely on those protocols when they sought the authorization from the Superior Court, incorporated them in to the proposed plan they presented and included [a] specific provision regarding "advance notification to the media". Once they relied on these guidelines, they are bound to follow what they told the Superior Court would be the checkpoint plan.

The responsibility of ensuring publication lies with the State. It is not the "whim of the media" that resulted in the absence of public notification. It was the failure to obtain the requisite Superior Court authorization sufficiently in advance of the proposed checkpoint date. The State could have postponed the checkpoint date to meet the terms of advance deterrent publicity and met its constitutional burden. It failed to do so.

For the reasons stated herein, the Court finds the State failed to follow through with an *essential element* of a constitutionally permissible checkpoint plan.

(Emphases added.) Significantly, the district court did not address Hunt's challenge to the sufficiency of the evidence presented to the superior court or the facial validity of the warrant it issued; the district court determined only that the PPD failed to provide the aggressive advance notice it promised in its petition to the superior court. This appeal followed.

II

The State argues that the district court erred by failing to perform the balancing test we established in *State v. Koppel*, 127 N.H. 286 (1985), and by treating the fact that the PPD issued its press release one day before the checkpoint as dispositive of the question of the checkpoint's constitutionality. The State also asks us to clarify our decisions in *Koppel* and *Opinion of the Justices* by explaining "whether, and to what extent, the factors discussed in those two cases are essential to the creation of a valid checkpoint plan, in light of the developments in case law and the evidence of checkpoint effectiveness discussed in the petition submitted to the superior court in this case." According to Hunt, the district court ruled correctly because: (1) failure to aggressively publicize the PPD checkpoint rendered it unconstitutional under Part I, Article 19 of the State Constitution; (2) failure to aggressively publicize the checkpoint rendered invalid the superior court order allowing the checkpoint, thus rendering the checkpoint unconstitutional under the State Constitution; and (3) sobriety checkpoints of any sort violate the State Constitution because they are ineffective at both detecting and deterring impaired drivers. According to Dahlen: (1) the trial court correctly ruled that inadequate publicity rendered the PPD checkpoint unconstitutional; (2) sobriety checkpoints violate the State Constitution; and (3) sobriety checkpoints violate the Fourth Amendment to the Federal Constitution.

Our review of the district court's order is *de novo*, except as to any controlling facts determined at the district court level in the first instance. *See State v. Livingston*, 153 N.H. 399, 402 (2006). We will affirm the trial

court's factual findings unless the evidence does not support them or they are legally erroneous. *In the Matter of Hampers & Hampers*, 154 N.H. 275, 279 (2006).

## III

On two occasions, in *Koppel* and in *Opinion of the Justices*, we have discussed the validity of sobriety checkpoints under Part I, Article 19 of the State Constitution. In *Koppel*, a case involving a sobriety checkpoint that was operated without any warning signs or advance publicity, *Koppel*, 127 N.H. at 288, we explained that stopping and detaining an automobile and its occupants, whether by roving patrol or roving roadblock, constitutes a seizure within the meaning of Article 19 of our State Constitution, *id.* at 289. We further explained that where the search or seizure of a motor vehicle is involved, Article 19 provides significantly greater protection than the Fourth Amendment against intrusion by the State. *Id.* at 291. We then established the following test:

> To justify the search or seizure of a motor vehicle, absent probable cause or even a reasonable suspicion that a criminal offense is being committed, the State must prove that its conduct significantly advances the public interest in a manner that outweighs the accompanying intrusion on individual rights. It must further prove that no less intrusive means are available to accomplish the State's goal.

*Id.* at 291-92. We stated that the validity of a sobriety checkpoint depends upon two factors: (1) whether it is more effective at advancing the public interest than other, less intrusive means; and (2) whether its value outweighs the degree of intrusion it involves. *Id.* at 292. We also identified two separate public interests that might be advanced by sobriety checkpoints: detection of drunk drivers and deterrence of drunk driving. *Id.* at 292-93. Regarding the deterrent effect of sobriety checkpoints, we observed that publicity about roadblocks is the chief means of deterrence and that the deterrent value of the checkpoint program in that case was lessened, and its potential for surprise was increased, by a complete lack of advance publicity. *Id.* at 293. Although we held that the particular program of sobriety checkpoints in that case violated Part I, Article 19 of the State Constitution, we did not hold that every sobriety checkpoint constitutes a *per se* violation of Article 19. That is, we left open the possibility that a properly designed and implemented program of sobriety checkpoints could meet constitutional requirements.

In *Opinion of the Justices*, we were asked by the legislature to determine the constitutionality of proposed legislation concerning sobriety

checkpoints. In the words of the legislature, the bill we considered provided

> that a judicial warrant authorizing the conduct of a sobriety checkpoint shall be issued upon application to any justice of a district, municipal, or superior court upon a finding by such justice that the checkpoint is a reasonable means of detecting, apprehending, and deterring impaired motorists, and that the interest of the state in maintaining such a checkpoint outweighs the intrusion upon individual rights.

*Opinion of the Justices*, 128 N.H. at 14. The bill also included a provision requiring notice at least seven days prior to the implementation of a sobriety checkpoint. *Id.* at 15. We characterized the bill as follows:

> The issuing municipal, district, or superior court justice would consider a variety of factors, to include the degree of intrusiveness of the proposed checkpoint, safety provisions, the relative effectiveness of such a checkpoint, the anticipated deterrent effect, and factors such as accident and DWI arrest statistics in the area in which the checkpoint would be conducted. The issuing justice would be required to make an express finding that the proposed checkpoint would be a reasonably effective means of detecting and apprehending impaired motorists, and that the public interest in DWI enforcement through this means would outweigh the intrusion visited upon the individual motorist. The bill incorporates a general notice requirement, calculated to achieve the maximum deterrent effect while not compromising the effectiveness of the checkpoint through disclosure of the precise location(s). The notice requirement would also have the salutary effect of minimizing apprehension on the part of motorists who are detained at the sobriety checkpoint.

*Id.* at 16. Based upon that understanding of the bill, we concluded that it was consistent with our analysis in *Koppel* and, therefore, that the checkpoint program it outlined would not violate Part I, Article 19. *Id.* at 16-17. In other words, in *Opinion of the Justices*, we answered the question left open in *Koppel* by determining that it was possible to establish a program of sobriety checkpoints that complied with Article 19.

Approximately six years after we issued *Opinion of the Justices*, the attorney general's office produced and disseminated, as chapter XXV of its 1993 Law Enforcement Manual, a set of guidelines for sobriety checkpoints. Among other things, those guidelines call for the achievement

of "maximum deterrent effect through aggressive public information efforts." Substantively, the guidelines provide:

> The chief advantage that sobriety checkpoints enjoy over more conventional DWI enforcement methods lies in their deterrent effect. Although information about a sobriety checkpoint program may be expected, over time, to pass by word of mouth, it is only through an aggressive program of advance publicity that the deterrent potential of a sobriety checkpoint program can be fully realized. Virtually every court which has addressed the sobriety checkpoint issue has suggested that advance publicity is an extremely important factor. Public awareness maximizes the deterrent value of the sobriety checkpoint, and minimizes fear and apprehension on the part of the motoring public.
>
> . . . .
>
> Law enforcement agencies should make full use of the various media resources available. Press conferences, press releases, radio and television coverage, posters and flyers should all be considered as means of increasing public awareness of the existence of sobriety checkpoints. Only through an aggressive public information campaign can the true deterrent value of sobriety checkpoints be realized. Advance notice through media sources, coupled with appropriate warning signs at the individual checkpoint site, substantially reduces apprehension occasioned by the sobriety checkpoint.

The legislation we considered in *Opinion of the Justices* did not become law, but approximately ten years later, the legislature enacted RSA 265:1-a (2004), which provides:

> **Sobriety Checkpoints.** Notwithstanding any provision of law to the contrary, no law enforcement officer or agency shall establish or conduct sobriety checkpoints for the purposes of enforcing the criminal laws of this state, unless such law enforcement officer or agency petitions the superior court and the court issues an order authorizing the sobriety checkpoint after determining that the sobriety checkpoint is warranted and the proposed method of stopping vehicles satisfies constitutional guarantees.

This case presents us with our first opportunity to determine the constitutionality of a sobriety checkpoint authorized under the process established by RSA 265:1-a.

## IV

We begin by rejecting the defendants' argument that sobriety checkpoints of any sort violate the State Constitution, which would require us to overrule *Opinion of the Justices. See State v. Holmes*, 154 N.H. 723, 724-25 (2007) (explaining principles of stare decisis).

■ The defendants have given us no reason to conclude that the State's interest in detecting and deterring drunk driving is any less today than it was when we decided *Koppel. See Koppel*, 127 N.H. at 292-93 (explaining that the State has a great interest in detecting drunk drivers and that roadblocks may also have a deterrent effect sufficient to outweigh their intrusion on individual rights). Nor have they given us any reason to conclude that properly designed and executed sobriety checkpoints are any more intrusive than we believed them to be when we issued *Opinion of the Justices*. Rather, they direct us to decisions from other states in which sobriety checkpoints have been found to violate state constitutions. *See, e.g., Ascher v. Commissioner of Public Safety*, 519 N.W.2d 183 (Minn. 1994); *Sitz v. Department of State Police*, 506 N.W.2d 209 (Mich. 1993); *Pimental v. Dept. of Transp.*, 561 A.2d 1348 (R.I. 1989); *City of Seattle v. Mesiani*, 755 P.2d 775 (Wash. 1988); *Nelson v. Lane County*, 743 P.2d 692 (Or. 1987). *But see* Annotation, *Validity of Police Roadblocks or Checkpoints for Purpose of Discovery of Alcoholic Intoxication—Post-Sitz Cases*, 74 A.L.R.5TH 319, 339-41 (1999 & Supp. 2006) (collecting state cases holding that sobriety checkpoints are not *per se* unconstitutional notwithstanding state constitutional provisions providing more protection than the Fourth Amendment). Beyond that, the defendants argue that sobriety checkpoints result in few DWI arrests and have no demonstrated deterrent effect. Of course, low arrest numbers may demonstrate the relative ineffectiveness of sobriety checkpoints for the detection of drunk drivers, but such numbers may also demonstrate effective deterrence. In any event, the defendants have given us no reason to reconsider our belief that sobriety checkpoints may have a deterrent effect sufficient to outweigh the accompanying intrusion on individual rights. *See Koppel*, 127 N.H. at 293. Thus, we decline to rule that sobriety checkpoints, in every instance, violate Part I, Article 19 of the State Constitution. Moreover, because the United States Supreme Court has held that sobriety checkpoints do not violate the Fourth Amendment to the United States Constitution, *see Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), we must necessarily reject the defendants' argument to the contrary.

V

Having disposed of the defendants' facial challenge to sobriety checkpoints, we turn to the State's argument that the district court erred by deciding that the PPD checkpoint in this case was unconstitutional because "no aggressive advance notice" was provided to the public. According to the State, the district court erred by making the question of advance notice dispositive and by failing to perform the balancing test we established in *Koppel*. Hunt argues that the PPD's failure to engage in aggressive advance notice obviated the need to perform the *Koppel* test and further argues that the PPD's failure to provide the type of advance notice promised in its petition to the superior court invalidated the warrant that court issued. Dahlen argues that the district court was not required to consider all of the *Koppel* factors and that even if it had done so, it would have been obligated to reach the same result.

■ We begin by addressing the State's argument that the district court erred by failing to perform the test we established in *Koppel*. It did not. In *Koppel*, we outlined an analytical framework for determining whether a particular sobriety checkpoint is permissible under the State Constitution. *Koppel*, 127 N.H. at 291-92. Subsequently, by establishing a procedure under which the superior court determines whether a proposed sobriety checkpoint "satisfies constitutional guarantees," RSA 265:1-a, the legislature gave the superior court the responsibility, in the first instance, of performing the test we set out in *Koppel*. An individual defendant, in turn, may challenge the introduction of evidence against him on grounds that it was collected unconstitutionally, but when addressing such a challenge, the trial court—be it the superior court or the district court—does not perform the *Koppel* test *de novo*. Instead, it assesses the validity of the superior court's warrant in the same way it would assess the validity of a search warrant. *See State v. Zwicker*, 151 N.H. 179, 185-86 (2004) (explaining that the court assigns great deference to a magistrate's determination of probable cause and interprets affidavits in support of search warrants realistically and with common sense). Accordingly, the district court did not err by failing to perform the *Koppel* test. While the district court had before it a challenge to the validity of the search warrant the superior court issued, it based its decision upon narrower grounds: its finding that the PPD failed to do what it had promised to do in its petition to the superior court. Because the district court did not rule upon the validity of the warrant, that issue has not been fully briefed, and so we decline to decide, in the first instance, whether the PPD provided the superior court with information sufficient to meet the *Koppel* test or whether the superior court properly issued the warrant.

The question before us is whether the district court correctly ruled that the PPD failed to meet constitutional standards in its operation of its sobriety checkpoint. Our analysis has both a legal and a factual component.

■ We turn first to the legal issue. In its order, the district court imposed upon the PPD the obligation to provide "aggressive advance notice to the public." While that language appears in the PPD's petition to the superior court, it is important to note that that language comes from the attorney general's guidelines for sobriety checkpoints, not from *Koppel* or *Opinion of the Justices*. Thus, to the extent the district court treated aggressive advance notice as a constitutional requirement, it erred. Aggressive notice—whatever it may be—is a worthwhile aspirational goal, not a constitutional requirement. Moreover, to the extent the district court construed the PPD's petition as promising aggressive advance notice, the court was not free to provide its own definition of that term and then fault the PPD for failing to give notice that met the court's definition. Rather, the relevant definition of "aggressive advance notice" is the one in paragraph seventeen of the petition and on page three of the PPD's operational plan, which was approved by the superior court. In both the petition and the operational plan, the PPD committed itself to sending a detailed press release to media outlets across the state and posting ample signage at the checkpoint site, which it did. Moreover, while the superior court had the authority to require the PPD to use various media resources mentioned in the attorney general's guidelines, those guidelines are not the law of this state; *Koppel* is, and while *Koppel* suggests the importance of advance publicity, *Koppel*, 127 N.H. at 293, it does not make advance publicity a constitutional requirement, much less impose a requirement of aggressive advance notice.

■ Next, we turn to the factual matter. Based upon the record before it, which included offers of proof that the PPD press release was distributed to local media on July 7 and published by *Foster's Daily Democrat* on July 8, the day of the first checkpoint and the day before the second one, the district court made a factual finding unsupported by the evidence when it determined that "in actuality, *no* aggressive advance notice to the public or envisioned advance publicity of this proposed sobriety checkpoint took place." (Emphasis added.) To the contrary, the PPD did provide advance notice of its checkpoint and that notice consisted of precisely what the PPD promised in paragraph seventeen of its petition: a detailed press release distributed to many press agencies across the state. Whether or not that advance publicity was sufficient to satisfy *Koppel* is another question, but we must reject the district court's conclusion, upon which the defendants rely, that the PPD did not provide any advance notice.

Because there was advance notice in this case, we leave for another day whether advance notice is an "essential element of a constitutionally permissible checkpoint plan." Rather, the question before us is whether the amount and timing of the advance notice in this case rendered the PPD checkpoints unconstitutional. We hold that they do not.

■ Regarding the timing of the notice the PPD provided, we begin by noting that to whatever extent the defendants rely upon the seven-day notice provision included in the legislation we approved in *Opinion of the Justices*, that reliance is misplaced. The most that can be said about the timing of advance notice of a sobriety checkpoint, based upon *Opinion of the Justices*, is that in the context of the legislation then before us, seven days advance notice was constitutionally adequate. But the fact that we approved of a proposed statute requiring seven-day notice says nothing about whether less notice could be constitutional. In this case, it might have been better if the press release had been issued earlier in the week— and Chief Magnant expected that the warrant was going to be issued on July 6 rather than July 7, which would have allowed the press release to go out a day earlier than it did—but on the other hand, it was noted at the hearing that media outlets do not want to receive sobriety checkpoint press releases too far in advance, and actually prefer to get them a day or two before the checkpoint is scheduled to be in operation. Here, the press release was issued on Thursday, July 7, and it appeared the following day in *Foster's Daily Democrat*, an afternoon newspaper. While the record does not indicate when on July 7 the press release was issued, if we assume that it went out before the end of the business day, then we may reasonably conclude that it was issued in time to appear in the next day's morning papers. Based upon the foregoing, we conclude that the timing of the press release did not render the PPD checkpoints constitutionally defective.

We reach the same conclusion with regard to the number of media outlets that printed the press release. As we have already observed, the PPD did what it promised to do in its petition; it sent a detailed press release to many media outlets. Apparently, only one decided to print it. While more may have been better, we hold that in this case, one was enough. The defendants concede that no other court has determined that a sobriety checkpoint was unconstitutional because it was publicized through only one media outlet. Moreover, several courts have held that sobriety checkpoints were constitutional, albeit under the Fourth Amendment, without any advance publicity. *See, e.g., State v. Barker*, 850 P.2d 885, 891 (Kan. 1993) ("There was no notice to the public at large. While this is a valid and desirable requirement, its absence does not by itself vitiate the

checklane."); *People v. Banks*, 863 P.2d 769, 782 (Cal. 1993); *cf. Com. v. Amaral*, 495 N.E.2d 276, 278 (Mass. 1986) (noting that advance publicity increases deterrent effect and decreases subjective impact on individuals but is not "an indispensable precondition to the reasonableness of a roadblock"). Finally, we note that the sobriety checkpoints in this case were part of a broader, multi-faceted program for detecting and deterring impaired motorists and that Chief Magnant stated, in his affidavit, that all of the PPD's initiatives in this area "carry with them heightened media attention." In light of that background media attention and the prevailing state of the law in other jurisdictions that have considered this issue, we hold that the timing and amount of advance notice in this case did not render the PPD checkpoints violative of Part I, Article 19 of the New Hampshire Constitution.

*Reversed and remanded.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.